IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JENNIFER CHAVEZ,                          :
                                          :
          Plaintiff,                      :
                                          :
v.                                        :     CIVIL ACTION NO.
                                          :     1:13-CV-00312-WSD-JCF
CREDIT NATION AUTO SALES, INC,            :
formerly known as SYNERGY MOTOR           :
COMPANY                                   :
                                          :
          Defendant.                      :

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Credit Nation Auto Sales, Inc.'s Motion for

Summary Judgment.  (Doc. 48).

## PROCEDURAL HISTORY

Plaintiff Jennifer Chavez was formerly employed by Credit Nation Auto

Sales, Inc. ("Credit Nation") as an automobile technician.  (Chavez Dep. at 64).

On January 30, 2013, she initiated this lawsuit against Credit Nation, alleging that

it terminated her because of her sex in violation of Title VII of the Civil Rights Act

of 1964, as amended, 42 U.S.C. § 2000 *et seq*. ("Title VII") and "Title I of the

Civil Rights Act of 1991, 42 U.S.C. § 1981(a) [sic]."  (Doc. 1).  Rather than file an

Answer, Credit Nation moved to dismiss Plaintiff's "42 U.S.C. § 1981(a)" claim

on the grounds that 42 U.S.C. § 1981(a) only applies to intentional discrimination

based on race, and Plaintiff's Title VII sex discrimination claim due to Plaintiff's failure to exhaust administrative remedies by timely filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") within 180 days of her termination (*see* Doc. 6 at 1-2). In an April 29, 2013 Order and Report and Recommendation ("R&R"), the undersigned recommended that Credit Nation's motion as to the 42 U.S.C. § 1981(a) claim be denied as moot because Plaintiff submitted an Amended Complaint in which she correctly asserted her claim for damages under Title VII pursuant to 42 U.S.C. § 1981a. (*See* Doc. 9 at ¶ 1; Doc. 20 at 10). The undersigned further recommended that Credit Nation's motion with respect to Plaintiff's Title VII claim be denied without prejudice because, even though the Plaintiff's EEOC charge was filed outside the 180-day limitation period, a proper resolution on the issue of equitable tolling required the consideration of materials outside the pleadings and additional factual development. (Doc. 20 at 1). In an August 19, 2013 Order, District Judge William S. Duffey Jr., adopted the undersigned's recommendations. (Doc. 35). Credit Nation answered the Amended Complaint (Doc. 23), and discovery proceeded.

Credit Nation has now filed a motion for summary judgment and a brief (Doc. 48), with supporting exhibits and a statement of undisputed material facts. (*See* Docs. 48-2 through 48-26). Plaintiff filed a response to Credit Nation's

motion (Doc. 58), a response to Credit Nation's statement of undisputed material facts (Doc. 59), a statement of material facts (Doc. 60), and affidavits from Plaintiff and Jillian T. Weiss, Plaintiff's attorney.  (Docs. 61 and 62).  Credit Nation submitted a reply brief (Doc. 71) and a response to Plaintiff's statement of material facts.  (Doc. 68).  Also included in the record are two amicus briefs in support of Plaintiff – one submitted by Freedom to Work, Gay and Lesbian Advocates and Defenders, Lambda Legal, National Center for Transgender Equality, PFLAG National, Transgender Law Center, and Transgender Legal Defense & Education Fund and the other filed by the EEOC.  (Docs. 63 and 67). With briefing complete, the undersigned turns to the merits.

## FACTS

The facts, for summary judgment purposes only, are derived from Credit Nation's statement of undisputed material facts (Doc. 48-2 hereinafter "Def. SMF"); Plaintiff's statement of material facts (Doc. 60 hereinafter "Pl. SMF");[1]

---

[1] Plaintiff's statement of material facts relies heavily on her declaration, which was submitted into evidence after Plaintiff's deposition had been taken.  (*See generally* Doc. 60).  Numerous statements in Plaintiff's declaration appear to contradict, without explanation, clear testimony Plaintiff previously provided at her deposition.  *See Van T. Junkins & Assoc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  To the extent that those contradictions concern material facts, they are discussed below where relevant.

Plaintiff's response to Credit Nation's statement of undisputed material facts (Doc. 59); Credit Nation's response to Plaintiff's statement of material facts (Doc. 68); Ms. Weiss and Plaintiff's affidavits in opposition to the motion for summary judgment (Docs. 61 and 62); and uncontroverted record evidence.

The undersigned has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried. Yet the court need not "scour the record" to make that determination. *Tomasini v. Mt. Sinai Med. Ctr. of Fla.*, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (internal quotation omitted). The facts are construed in the light most favorable to Plaintiff as the non-movant. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001).

### A.   <u>Background</u>

Plaintiff is an "A.S.E. certified" master automobile technician who has worked in the automobile repair industry for nearly 40 years. (Doc. 49-5 at 3; Doc. 49-6 at 1). In June 2008, she accepted a job as an automobile technician with Credit Nation, a business that sells and repairs automobiles. (Doc. 49 at 64 (hereinafter "Chavez Dep."); Doc. 57 at 11 (hereinafter "Torcia Dep.")). At that time, Plaintiff was known as Louie Chavez and presented herself as a male; however, she had known for many years that she was a transsexual and wanted to transition from a male to a female. (Chavez Dep. at 37; Doc. 49-8 at 1). In the

4

summer of 2009, Plaintiff decided to go through a gender transition because "[she] could no longer run from [her] condition" and "did not want to die having lived a lie."  (Chavez Dep. at 37).   Following steps and guidelines from the World Professional Association for Transgendered Health, Plaintiff started seeing a mental health therapist, attending Southeast Association for Gender Education meetings (a transsexual support group), and preparing to inform Credit Nation about her condition and intentions of transitioning.  (*Id.* at 35, 39, 40-41).

### B. Plaintiff's Announcement Of The Intent To Transition

Plaintiff "felt pretty good about the reception that [she] would receive" from Credit Nation, so she approached her supervisor, Phil Weston, and told him that she had something important to discuss and that she would like to meet with both him and Cindy Weston, the Vice-President of Credit Nation.  (Chavez Dep. at 41-42).  On October 28, 2009, Plaintiff met with Mr. and Mrs. Weston and told them about her condition and her plan to transition from a male to a female.  (*Id.* at 43).  Mr. and Mrs. Weston were both "extraordinarily kind," and reassured Plaintiff that she had "nothing to fear" and had "their 100 percent support."  (*Id.* at 44).  As Mrs. Weston saw it, Plaintiff's transition was "her personal preference" and "as long as her job was being performed, what she d[id] in her personal life really [wasn't] any of [her] business."  (Doc. 64 at 29 (hereinafter "Weston Dep.")).  After speaking with Plaintiff, Mrs. Weston called Jim Torcia, the owner of Credit Nation, and

informed him about Plaintiff's plan.  (Torcia Dep. at 19-20).  Mr. Torcia testified that learning about Plaintiff's plan to transition from male to female "[d]idn't move the needle for [him]."  (*Id.*).

The day after the meeting, Plaintiff, along with Mr. and Mrs. Weston, met with a number of Credit Nation's service facility employees so that Plaintiff could explain her transition from male to female.  (Chavez Dep. at 44-45).  All of the service facility employees were incredibly receptive and supportive of Plaintiff; "they all said they had no issues with" her transition.  (*Id.* at 45-46).

A week later, Plaintiff sent an e-mail to a reporter from the Atlanta Journal Constitution detailing the circumstances of her announcement.  (Doc. 49-6).  The reporter Plaintiff contacted had recently written an article about Vandy Beth Glenn, a transsexual woman who won a discrimination case against her employer in federal court.  (Chavez Dep. at 29).  According to Plaintiff, the purpose of the e-mail was to provide a "counterpoint to the opinions of [Vandy Beth Glenn's] former employer."  (Doc. 49-6 at 1-2).[2]  Plaintiff wrote:

> I asked for a meeting with my supervisor and the vice-president of the company, after very nervously telling my story, I was surprised to find that they both were extraordinarily understanding, kind and

---

[2] Vandy Beth Glenn's former supervisor "testified at his deposition that he fired [her] because he considered it 'inappropriate' for her to appear at work dressed as a woman and that he found it 'unsettling' and 'unnatural' that [she] would appear wearing women's clothing."  *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011).

compassionate to hear what I was facing.  Not only did they assure me I had nothing to worry about in losing my job, but they made sure that I understood that I had their support and offered any help that they could in completing my transition.  The vp went back to her office and called the owner [Jim Torcia] to inform him and see if he agreed with their summation.  He too was very supportive and was only concerned that I would be able to continue doing my job, and if that was not a concern then I had nothing to worry about as well.  He made sure that all employees understood the no harassment policy and that anyone who committed an infraction would be terminated.  All managers and employees were informed, and to my surprise and delight, I was met with nothing but kindness from all employees, even the crotchety old southern guys who I thought were set in their ways.

(*Id.*).

## C.    Events Occuring Between The Announcement And Termination

According to Plaintiff, the warm and receptive environment at Credit Nation ended two weeks after her announcement on November 12, 2009, when Mrs. Weston approached Plaintiff and advised her that she needed to "tone things down." (Chavez Dep. at 47).  Mrs. Weston explained that she made this statement after receiving complaints about Plaintiff "visiting the other technicians' stalls" and "talking [] about surgeries that she was going to be undergoing," including breast augmentation, which made some of the other technicians uncomfortable.  (Weston Dep. at 34).  Plaintiff initially testified that Mrs. Weston did not "specify" whether Mr. Torcia "said something to [Mrs. Weston]," but it is her "supposition" that he did.  (Chavez Dep. at 47).  Later at her deposition, however, Plaintiff testified that Mrs. Weston "told [her] to tone it down because Mr. Torcia didn't like" the

discussions she was having with other technicians about her transition.  (*Id.* at 131).[3]

Five days later, Plaintiff had a disagreement with Richard Randall, another technician at Credit Nation.  (*Id.* at 48).  The dispute started when Plaintiff advised Randall that he was being dishonest about a car repair, which caused Randall to become upset and yell at Plaintiff.  (*Id.*).  According to a Credit Nation discipline report, during the altercation between Plaintiff and Randall, Plaintiff made both written and verbal "derogatory comments"; as a result, she received a verbal disciplinary warning from Mrs. Weston.  (Doc. 49-7 at 1).  At her deposition, Plaintiff testified that, when she signed the disciplinary report on December 17, 2009, the word "Agree" was written next to the words "Describe Employee

---

[3] Credit Nation asserts that Mrs. Weston's statements, as relayed by Plaintiff, are inadmissible hearsay and may not be considered on summary judgment.  *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.").  "One of the exceptions from the definition of hearsay is 'a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship,' which is deemed an admission by a party opponent."  *Singleton v. Autozoners LLC*, No. 8:12–cv–2641–T–30TGW, 2013 WL 5954781, at *7 (M.D. Fla. Nov. 7, 2013) (quoting FED. R. EVID. 801(d)(2)(D)).  As a result, "statements made by a supervisory official who plays some role in the decision making process are generally admissible." *Zaben v. Air Prods. & Chem., Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997).  Mrs. Weston served as the Vice-President of Credit Nation and was intimately involved in the termination decision – she spoke on the phone with Mr. Torcia about the decision and ultimately informed Plaintiff about her termination.  (Chavez Dep. at 41-42, 106; Weston Dep. at 74).  Her statements therefore are admissible.

Response," but that she nevertheless wrote her version "of what took place" at the bottom of the disciplinary report. (Chavez Dep. at 52-53).[4]  She further stated that she did not remember what the written or verbal comments were and did not know whether this incident with Randall had anything to do with her gender transition. (Chavez Dep. at 50).

On November 24, 2009, Mr. Torcia came to the service facility and called Plaintiff into a meeting, at which time he told "[Plaintiff] his concerns, worr[ies], and apprehension[s]" with her gender transition.  (*Id.* at 81).  He stated that he was "nervous about it" and afraid that it may "impact his business" – he noted that "an applicant for a tech position had declined his offer of employment because of [Plaintiff's] transition."  (*Id.* at 82).  He also said that Plaintiff's "attire was upsetting the other personnel" at Credit Nation, and therefore, Plaintiff "should not wear too feminine attire … coming to work or leaving work," even after her transition.  (*Id.* at 84-85).[5]  Mr. Torcia further expressed his concern with Plaintiff

---

[4] The bottom of the disciplinary report, where Plaintiff allegedly explained her version of the events on December 17, 2009, is blacked out, making it impossible to decipher what Plaintiff wrote.  (Doc. 49-7 at 1).

[5] Credit Nation asserts that Plaintiff's testimony about Mr. Torcia's statements is inadmissible hearsay and may not be considered on summary judgment.  (Doc. 68 at ¶ 4).  The undersigned disagrees.  As previously explained, "statements made by a supervisory official who plays some role in the decision making process are generally admissible." *Zaben*, 129 F.3d 1453 at 1456.  Mr. Torcia is the owner of Credit Nation and made the decision to terminate Plaintiff's employment (Pl. SMF at ¶ 41); consequently, his statements are admissable.

wearing dresses, skirts, and heels in the service department work area in violation of Credit Nation's uniform attire rules, which require shoes with a rubber bottom on them (to help service department employees walk on greasy and slippery floors) and work pants and a uniform shirt. (Weston Dep. at 37-39).

In early December 2009, with the first round of gender transition surgeries approaching, Plaintiff and Credit Nation entered into a memorandum of understanding regarding Plaintiff's "voluntary leave of absence for the purpose of obtaining elective medical procedures." (Doc. 49-13 at 2; Chavez Dep. at 75). Credit Nation granted Plaintiff voluntary leave beginning December 18, 2009 and ending December 27, 2009 (Plaintiff was expected to return to work on December 28, 2009). (Doc. 49-13 at 2-3). Under Credit Nation's leave policy, an employee receives one week's paid vacation after completing one year of service and two weeks of paid vacation after completing two years of service. (Chavez Dep. at 64). At that point, Plaintiff had accrued one week's paid vacation time (she had worked at Credit Nation for only a year and a half), so she originally scheduled to be "off for one week of recovery time after her surgery." (*Id.* at 64). But Mrs. Weston, on her own initiative, spoke with Mr. Torcia, and the two of them agreed to provide Plaintiff with an additional week of paid vacation time, even though she was not entitled to such under Credit Nation's leave policy, because they wanted to "be accommodating to the procedures." (*Id.* at 64-65; Torcia Dep. at 59).

10

On December 15, 2009, Plaintiff had a second altercation with Randall. This time, Randall confronted Plaintiff because he felt like "[Plaintiff] was getting special treatment from [Mrs. Weston]" – in particular, she was "allowed to go to the doctor's appointments"; "do[] electrolysis almost every morning"; and "take[] excessive unpaid time to attend these doctor and therapist appointments and such." (Chavez Dep. at 61).  Like Randall, other technicians were also "upset and thought that [Plaintiff] was getting special treatment by being able to take time off from work and not having to make it up."  (Weston Dep. at 148).  In response to Randall's statements, Plaintiff said something to the effect that she "had [Mrs. Weston's] personal number" and therefore no one could mess with her.  (Chavez Dep. at 59-60; Doc. 56-9).

According to a December 16, 2009 statement, and Mrs. Weston's deposition testimony, Mrs. Weston and Plaintiff spoke about the incident with Randall the day after it occurred – Mrs. Weston told Plaintiff "that it had been brought to [her] attention that [Plaintiff] had given the other employees the impression that [Mrs. Weston] had given [Plaintiff her] cell phone number which made [Plaintiff] special."  (Doc. 49-10; Weston Dep. at 144).  Mrs. Weston testified that she gave Plaintiff a verbal warning for the incident, (Doc. 49-7; Weston Dep. at 22), and also "personally gave [her] business card," which had Mrs. Weston's personal cell phone number on it, "to everybody in the shop so that they would all have [her]

phone number" and would not think "that [she] was[] treating anyone any differently." (Weston Dep. at 118).  Plaintiff denies receiving a verbal warning or a disciplinary write-up for this incident but admits making the statement to Randall.  (Chavez Dep. at 54, 59-60).

Also on December 16, 2009, Credit Nation issued a memo to all service personnel "explaining to them once again" that they are supposed to be "in uniform and at their work stations to begin working" at 8:00 a.m Monday through Friday and 9:00 a.m on Saturday, and that all "technicians will work until 5:50 pm [on Monday through Friday] at which time they may start cleaning up and changing in order to leave by 6:00 pm." (*Id.* at 46; Doc. 64-8).  This memo was issued for all the technicians but, according to Mrs. Weston, at that point "[Plaintiff] was the only one who wasn't following the rules" – Mrs. Weston testified that she personally saw Plaintiff "a couple of times" changing into heels and a dress at around 5:30 p.m and then going back into the service facility area.  (Weston Dep. at 37-38).

On December 30, 2009, two days after Plaintiff returned from leave, Plaintiff was told by Kirk Nuhibian, the shop foreman, that she could not use Credit Nation's unisex bathroom.  (Chavez Dep. at 73; Doc. 49-14).  There are two bathrooms at Credit Nation – a technician's bathroom and a unisex bathroom used by customers and Credit Nation office personnel, including a female employee

from the parts department.  (Chavez Dep. at 73-74; Doc. 56 at 113 (hereinafter "Nuhibian Dep."); Weston Dep. at 53 (explaining that customer bathroom was "a unisex restroom")).   Technicians are required to use the technician's bathroom because it has "special soap in there" that helps remove grease off of the technician's hands, and because the technicians wear "dirty clothes" and accumulate oil and grease on their shoes.  (Chavez Dep. at 74; Nuhibian Dep. at 114; Weston Dep. at 52).  According to Plaintiff, the technician's bathroom "was quite dirty and grimy" and "it was hard to use … without ruining clothes" (at that point, Plaintiff's "clothing was female coming to and leaving work") so she "had been using [the unisex] customer bathroom that was a lot cleaner."  (Chavez Dep. at 73).  Mr. Nuhibian, however, instructed Plaintiff that she could not use the unisex customer bathroom – this upset Plaintiff "because [it] meant [she] was going to be ruining clothes, and [she] didn't like that." (*Id.*).

Later on that day, Mrs. Weston e-mailed John McManus, an attorney who handled legal matters for Credit Nation, for advice on the situation concerning the bathroom because she did not "know how to handle [it]."  (Weston Dep. at 49-50).  She wrote:

> I wanted to give you a run down on what occurred today … There are two restrooms located at the Service Center, both are unisex bathrooms.  One is designated at [sic] Technicians [sic] restroom and the other is customer and office personnel.  The technicians are required to have their own restroom due to the oil and grease that accoumilate [sic] on the bottom of their shoes and clothes.  There was

a meeting discussing this two weeks prior … [Plaintiff] returned today and confronted the shop foreman asking why there was restricted access to the customer restroom?  [She] was told by the shop foreman "all technicians have their own restroom, and we have to keep the customer restroom clean for the customers".  [Plaintiff] asked who is allowed to use it?  Shop foreman repsonded [sic] "Customers, Matt, Philip, Ariel, and Jennifer (parts), everyone except technicians due to the grease on shoes." … [Plaintiff] responded "If Jennifer in parts can use it why can't I use it, that is decrimination [sic], I will speak with Phil about it." … Phil came in and [Plaintiff] approached him and asked why can't we use the customer restroom?  Phil stated, technicians have their own restroom, and remember the meeting we had two weeks ago about the restroom use?  [Plaintiff] shrugged [her] shoulders and turned and walked away.

(Doc. 60-8 at 2-3) (formatting altered).  She further explained to Mr. McManus that Plaintiff hit her head while removing a transmission from a vehicle and that she and Mr. Weston "filled out an incident report and state[d] that [Plaintiff] denied medical attention."  (*Id.*).  Mr. McManus responded with the following e-mail:

Cindy: I am concerned that no matter what you do, [Plaintiff] is going to come up with come [sic] complaint.  I think you are correct in writing the medical report up, and I believe there needs to be some report written by Phil indicating the issues about the restroom and how that was resolved.  Tomorrow will bring more issues and I think this will get to a breaking point before  very  long.   Just  have  the management focus on work and performance of required duties and the other issues should be written up one at a time.

(*Id.*).

### D.    **Plaintiff's Termination**

On Friday January 8, 2010, it was "very, very cold … and the roads were icy."  (Chavez Dep. at 77).   Under these circumstances i.e., snow or similar inclement weather, if a Credit Nation employee can "make it into work then [they] ma[ke] it in"; "otherwise, [they] ma[ke] it as soon as [they can]."  (Weston Dep. at 89).  If a Credit Nation employee cannot make it in to work at all because of the weather, they are not penalized; they just receive no pay for that day.  (*Id.* at 89).  In any event, Plaintiff arrived at work early on January 8, 2010, and clocked in around 7:39 a.m.; she did not, however, change into her required uniform.  (Chavez Dep. at 77; Chavez Decl. at ¶ 86).  The vehicles Plaintiff was supposed to be working on did not have parts – "[the cars] had been inspected and diagnosed and parts were ordered, but the parts had not yet arrived" – so Plaintiff "had nothing to do."  (Chavez Dep. at 77).  After waiting around for an hour and a half, Plaintiff "decided to sit in back of one of the cars [she] was working on … to try and get a little bit warm."  (*Id.* at 78).  Although she did not intend to, Plaintiff fell asleep in the back of the car.  (*Id.*).

At around 9:20 a.m that morning, Mr. Nuhibian observed Plaintiff sleeping in the back seat of a customer's car located in one of her work stalls.  (Nuhibian Dep. at 42).  He decided to take a picture of Plaintiff sleeping and send it to his supervisor, Phil Weston; he also called and e-mailed Mr. Weston to make sure he

received the photo.  (*Id.* at 47, 105).  Mr. Nuhibian testified that he took a picture of Plaintiff because of his "[p]ast experience" with Credit Nation technicians: on previous occasions, Mr Nuhibian would say that a technician violated a rule, but the technician would just deny any wrongdoing, which "ma[de Mr. Nuhibian] look bad" − by taking a picture, he could actually provide evidence to "back up what [he] saw." (*Id.* at 48, 55).

After Mr. Weston received Mr. Nuhibian's photo, he sent it to Mrs. Weston and also asked Mr. Nuhibian if Plaintiff was still asleep in the car.  (*Id.* at 56; Weston Dep. at 59).  Mr. Nuhibian walked back over to the car around 9:35 a.m. and saw that Plaintiff was sleeping; when he returned to the car ten minutes later, Plaintiff was still asleep.  (Nuhibian Dep. at 57).  At approximately 9:55 a.m., Plaintiff "heard a noise and [she] looked up and realized that [she] had nodded off without intending to." (Chavez Dep. at 78).  The noise Plaintiff heard was "a parts delivery person" bringing in the parts she needed to repair the vehicles she was working on, so Plaintiff went and changed into her uniform and began performing repairs.  (*Id.* at 78-79).  She worked through the day Friday without further incident and then went home for the weekend.  (*Id.* at 105).

At some point before Plaintiff's termination, Mr. and Mrs. Weston met to discuss the photograph of Plaintiff sleeping in a customer's car.  (Weston Dep. at 60).  The substance of the conversation between Mr. and Mrs. Weston was "[t]hat

16

[Plaintiff] was sleeping in the back of a customer's car in the service department while on the clock, which is against [Credit Nation] policy." (*Id.* at 60).  Soon thereafter, Mrs. Weston contacted Mr. Torcia, and the two of them discussed the situation.  (*Id.* at 74; Torcia Dep. at 28).  They ultimately agreed that Plaintiff should be fired, and Mr. Torcia instructed Mrs. Weston to terminate Plaintiff.  (*Id.* at 74; Torcia Dep. at 28).

Plaintiff returned to work on Monday January 11th and "[w]orked all day long until approximately 4:00 p.m." when "[she] was called into the office upstairs by Phil Weston." (Chavez Dep. at 105).  In the office, Plaintiff met with Mr. and Mrs. Weston and Credit Nation's General Manager, Steve Duda, and Human Resources Director, Kelly Bourgeois.  (*Id.* at 106; Weston Dep. at 14).  Mrs. Weston explained to Plaintiff that "[she] had been observed sleeping, that [sleeping on the job on company time] was against company policy, and [that she] was being terminated for it."  (Chavez Dep. at 106).  In response, Plaintiff stated "I know exactly what this is … if you are going to fire me, fire me." (*Id.*).  A January 11, 2011 separation notice, a copy of which was delivered to Plaintiff at the termination meeting, explicitly states that Plaintiff was terminated for "[s]leeping while on the clock on company time."  (Doc. 60-16 at 2; Weston Dep. at 65).

Under section 701 of Credit Nation's employee handbook, entitled "Employee Conduct and Work Rules," Credit Nation lays out twenty-six

infractions "that may result in disciplinary action, up to and including termination of employment." (Doc. 49-36 at 15). One such infraction is "[t]heft or inappropriate removal or possession of property." (*Id.*). Under section 717 of the handbook, theft of company property is listed as an action that "may result in immediate discharge." (*Id.* at 21). To determine whether an individual should be terminated under these provisions, Credit Nation looks at the "severity" of the infraction. (Weston Dep. at 103). Mrs. Weston and Mr. Torcia both testified that they believe sleeping on the clock constitutes theft because an employee is being paid but not working, (*see* Weston Dep. at 102; Torcia Dep. at 30-31), and that Plaintiff's infraction was a severe violation. (Weston Dep. at 103, 105; Torcia Dep. at 83). Mrs. Weston further testified that another Credit Nation employee, who did not have any previous write-ups in his file, had similarly been terminated for sleeping on the clock. (Weston Dep. at 112).

### E.   **Plaintiff's EEOC Charge**

The day after her termination, Plaintiff, without counsel, went to the Atlanta District office of the EEOC and brought her separation notice, a pay stub from Credit Nation, a portion of the Credit Nation employee handbook, and notes she took of the November 24, 2009 meeting with Mrs. Weston and Mr. Torcia. (Chavez Decl. at ¶ 107). After completing a questionnaire, Plaintiff met with an EEOC investigator and handed her the documentation she had brought and told her

Credit Nation had discriminated against her because of her sex i.e., because she "transition[ed] from a male to a female." (Chavez Dep. at 149; Doc. 49-34). After talking with Plaintiff for about 20 to 30 minutes, the EEOC investigator went to speak to her supervisors about Plaintiff's case. (Chavez Dep. at 149-150). When she returned, the EEOC investigator informed Plaintiff "[she] was not protected from discrimination on the basis of sex because [she is] transgender," (Chavez Decl. at ¶ 116), and "[she] would not be permitted to file a complaint." (Doc. 49-34).[6] Plaintiff left the office without having filed a formal complaint.

In September 2010, Plaintiff, "[a]fter hearing news reports about transgender individuals filing complaints with the EEOC," again went to the Atlanta District EEOC office to try to file a charge of discrimination. (Chavez Decl. at ¶ 119). As had occurred on her previous visit, Plaintiff spoke to an EEOC investigator, handed him her documentation – her separation notice, a pay stub from Credit Nation, a portion of the Credit Nation employee handbook, and notes she took of the November 24, 2009 meeting with Mrs. Weston and Mr. Torcia – told him Credit Nation discriminated against her because of her sex, and asked the agency to take action against Credit Nation. (*Id.* at ¶ 120-121). The EEOC investigator

---

[6] In a December 19, 2012 letter, the EEOC indicated: "A review of our records revealed that [Plaintiff] visited the Atlanta District Office on January 12, 2010, to file a charge of employment discrimination against Credit Nation," but that a charge "was not filed at that time." (*See* Doc. 10–1 at 18).

filled out an intake questionnaire and took notes, but he ultimately concluded that "[Plaintiff] was not protected from discrimination on the basis of sex because [she is] transgender" and told her she could not file a charge of discrimination. (*Id.* at ¶¶ 122-124).

In April 2012, "[a]fter hearing further news reports about transgender individuals filing complaints with the EEOC," Plaintiff returned to the Atlanta District EEOC office and requested to file a complaint. (*Id.* at ¶ 128). This time, Plaintiff was permitted to file a complaint, (*see id.* at ¶ 129), and in her Charge of Discrimination, she alleges Credit Nation discriminated against her by terminating her employment "because of [her] gender (sex stereotyping), in violation of Title VII." (Doc. 48-3 at 2).

## **DISCUSSION**

### I.   **Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[] . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV.

P. 56(c)(1).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986); *see also Arnold v. Litton Loan Servicing, LP*, No. 1:08-cv-2623-WSD, 2009 WL 5200292, at *4 (N.D. Ga. Dec. 23, 2009) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact." (citing *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999)).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, she must respond by going beyond the pleadings, and by her own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  *See Celotex*, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' "  *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *cert. denied*, 506 U.S. 952 (1992); *see also* FED. R. CIV. P. 56(c)(1)(B),

(c)(4).    The evidence "cannot consist of conclusory allegations or legal conclusions." *Avirgan*, 932 F.2d at 1577.  Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  *See Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984).

For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).  It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter.  *Id.* at 249, 255.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255.

## II.    <u>Plaintiff's Title VII Sex Discrimination Claim</u>

Credit Nation contends summary judgment should be granted on Plaintiff's Title VII sex discrimination claim for two distinct reasons: (1) Plaintiff failed to exhaust her administrative remedies before asserting her Title VII discrimination claim as she failed to file a timely charge of discrimination with the EEOC, and the principle of equitable tolling does not apply because the EEOC "did not mislead

[Plaintiff] as to the nature of her rights" under Title VII; and (2) Plaintiff has not established that Credit Nation discriminated against her because of her sex. (Doc. 48-1 at 1-2, 6). The undersigned addresses each argument in turn.

### A.     Exhaustion Of Administrative Remedies

### 1.     Did Plaintiff File A Timely EEOC Charge?

"Before suing under Title VII, a plaintiff must first exhaust her administrative remedies." *H&R Block E. Enters. v. Morris*, 606 F.3d 1285, 1295 (11th Cir. 2010). "To do so, a plaintiff must file a timely charge of discrimination with the EEOC within 180 days of the last discriminatory act." *Id*; *see also Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) (explaining that "[b]ecause Georgia is a non-deferral state, [the plaintiff] was required to file a Charge of Discrimination within 180 days of the alleged unlawful employment action") (citing 42 U.S.C. § 2000e-5(e)(1)).

In an April 29, 2013 R&R, the undersigned concluded that Plaintiff failed to meet her burden of showing that she filed a valid EEOC charge within the 180-day period. (Doc. 20 at 11-14). Plaintiff objected to that finding in the R&R, but District Judge William S. Duffey, Jr., after conducting a *de novo* review, overruled her objections and agreed with the undersigned that Plaintiff had not demonstrated that she filed a valid EEOC charge in a timely fashion. (*See* Doc. 35 at 6-10). In her response to the summary judgment motion, Plaintiff does not provide any new

arguments or facts that would call into question the undersigned's previous conclusion.  As a result, the undersigned once again finds that Plaintiff failed to establish that she submitted a valid EEOC Charge within the 180-day period.

### 2.    Does Equitable Tolling Excuse The Late Filing?

Plaintiff argues that, even if the undersigned finds that she did not timely file her EEOC charge, the court should equitably toll the statute of limitations period because EEOC personnel prevented her from being able to file a charge by misinforming her about her rights. (Doc. 58 at 2).  Specifically, she contends that she tried to file a charge the day after she was terminated, but EEOC personnel told her that she could not file a charge of sex discrimination based on being transgender.  (*Id.*).  Credit Nation's principal argument is that the EEOC did not mislead Plaintiff as to her rights under Title VII because, at the time Plaintiff attempted to file an EEOC charge, the Eleventh Circuit had not held that "Title VII prohibits discrimination against transgender or transsexual individuals."  (Doc. 48-1 at 7).

"Title VII's timely-filing requirement is non-jurisdictional, so it may be subject to equitable tolling."  *Bourne v. Sch. Bd.*, 508 Fed. Appx. 907, 909 (11th Cir. 2013) (unpublished opinion).  "A court may toll a statute of limitations only if it finds that an inequitable event prevented the plaintiff from filing a timely action, *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993), and the plaintiff has

the burden in establishing the grounds for equitable tolling, *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004)." *Patel v. Ga. Dep't of Behavioral Health & Devel.*, 517 Fed. Appx. 750, 753 (11th Cir. 2013) (unpublished decision). "Equitable tolling is an extraordinary remedy which should be extended only sparingly." *Bost*, 372 F.3d at 1242 (quotation omitted). The Eleventh Circuit has "recognized three distinct situations in which the Title VII limitation periods may be equitably tolled:

> (1) during the pendency of an action against the same parties and involving the same cause of action in a state court which had jurisdiction over the subject matter of the suit but was the wrong forum under state law; (2) when the defendant concealed facts that support the plaintiff's cause of action, until such time as the plaintiff knew or should have known of these facts; and (3) when the EEOC misleads a complainant about the nature of his rights under Title VII."

*Jones v. Wynne*, 266 Fed. Appx. 903, 906 (11th Cir. 2008) (unpublished decision) (citing *Chappell v. Emco Mach. Works Co.*, 601 F.2d 1295, 1302–03 (5th Cir. 1979))[7]. Plaintiff asserts that this case falls under the third scenario; she claims the statute of limitations should be equitably tolled because the EEOC misled her by informing her that she could not file a sex discrimination claim because she is transgender. (Doc. 58 at 2). The undersigned agrees.

---

[7] Decisions of the Fifth Circuit handed down before October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Credit Nation's primary contention is that the EEOC did not mislead Plaintiff as to the nature of her rights under Title VII because the "Eleventh Circuit has not held that Title VII prohibits discrimination against transgender or transsexual individual." (Doc. 48-1 at 7). It is true that before the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a number of courts concluded that Title VII provided no protection to transgender victims of discrimination because the term "sex" as used in Title VII encompassed only discrimination based on biological sex. *See, e.g.*, *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1087 (7th Cir. 1984) (concluding that the plaintiff had not been discriminated against because of her sex under Title VII because the discrimination against the plaintiff was "not because she [was] female, but because she [was] transsexual"); *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) (rejecting the transgender plaintiff's claim as falling outside "the traditional definition" of sex under Title VII); *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir. 1977) ("Congress has not shown any intent other than to restrict the term 'sex' to its traditional meaning."). Yet in *Price Waterhouse*, the Supreme Court held that discrimination on the basis of gender stereotypes is also sex-based discrimination under Title VII. In that case, the plaintiff, a female senior manager at Price Waterhouse, was denied partnership in the firm because she was considered "macho," and "overcompensated for being a

woman." *Price Waterhouse*, 490 U.S. at 235.  Six members of the Court agreed that such comments were evidence of gender discrimination and held that Title VII barred not just discrimination based on biological sex, but also gender stereotyping i.e., failing to act and appear according to expectations defined by gender.  *Id.* at 250–51 (plurality opinion); *id.* at 258–61 (White, J., concurring); *id.* at 272–73 (O'Connor, J., concurring).   The Court emphasized that "[a]s for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group …." *Id.* at 251, 109 S.Ct. 1775.

After *Price Waterhouse*, several circuits expressly recognized a Title VII claim for discrimination based on an employee's failure to conform to stereotypical gender norms.  *See, e.g.*, *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262-64 (3d Cir. 2001) (explaining that a plaintiff may be able to prove a claim of sex discrimination by showing that the "harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender"); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 874-75 (9th Cir. 2001) (concluding that harassment "based upon the perception that [the plaintiff] is effeminate" is discrimination because of sex, in violation of Title VII); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999) ("[J]ust as a woman can ground an action on a claim that men discriminated against her because she did not

meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotypical expectations of masculinity."); *Doe by Doe v. City of Belleville*, 119 F.3d 563, 580-81 (7th Cir. 1997) (holding that "Title VII does not permit an employee to be treated adversely because his or her appearance or conduct does not conform to stereotypical gender roles" and stating that "a man who is harassed because his voice is soft, his physique is slight, his hair long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of his sex' "), *vacated on other grounds*, 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998). Additionally, federal courts explicitly "recognized with near-total uniformity that 'the approach in *Holloway*, *Sommers*, and *Ulane* ... ha[d] been eviscerated' by *Price Waterhouse's* holding that 'Title VII's reference to 'sex' encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms.' " *Glenn v. Brumby*, 663 F.3d 1312, 1318 n.5 (11th Cir. 2011) (quoting *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004)); *see also Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000) ("The initial judicial approach taken in cases such as *Holloway* has been overruled by the logic and language of *Price Waterhouse*.").

In *Smith*, the Sixth Circuit applied the reasoning of *Price Waterhouse* and concluded that discrimination against a transsexual because of her gender-nonconformity is actionable sex discrimination under Title VII.  378 F.3d at 566 In particular, the court held that the city's decision to suspend the plaintiff – a transsexual firefighter – because of "his transsexualism and its manifestations" was discrimination against him "based on his failure to conform to sex stereotypes by expressing less masculine, and more feminine mannerisms and appearance."  *Id.* at 569, 572; *see also Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (holding that transsexual plaintiff stated a claim for sex discrimination under Title VII "by alleging discrimination ... for his failure to conform to sex stereotypes"). Analogizing to Title VII, and applying the rationale of *Price Waterhouse*, other circuits similarly held that discrimination against transsexuals for failure to conform to sex stereotypes is sex discrimination.  *See Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000) (concluding a transsexual could state a claim for sex discrimination under Equal Credit Opportunity Act by analogizing to Title VII); *Schwenk*, 204 F.3d at 1198-1203 (analogizing to Title VII and concluding that a male-to-female transgender plaintiff who was harassed because he presented and defined himself as a woman had stated a claim for sex discrimination under the Gender Motivated Violence Act because "the

perpetrator's actions stem from the fact that he believed that the victim was a man who 'failed to act like one' ").

District courts likewise concluded that transsexuals could state a claim for sex discrimination under Title VII for failure to comply with gender stereotypes. *See Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542 F. Supp. 2d 653, 659-661 (S.D. Tex. 2008) ("Title VII is violated when an employer discriminates against any employee, transsexual or not, because he or she has failed to act or appear sufficiently masculine or feminine enough for an employer.") (quoting *Schroer v. Billington*, 525 F. Supp. 2d 58, 63 (D.D.C. 2007)); *Mitchell v. Axcan Scandipharm*, No. Civ.A. 05-243, 2006 WL 456173, at *2 (W.D. Pa. Feb. 21, 2006) (holding that a transgender plaintiff may state a sex discrimination claim under Title VII by "showing that his failure to conform to sex stereotypes of how a man should look and behave was the catalyst behind defendant's actions"); *Kastl v. Maricopa Cnty. Comm. College Dist.*, No. Civ.02–1531PHX–SRB, 2004 WL 2008954, at *2-3 (D. Ariz. June 3, 2004) ("[N]either a woman with male genitalia nor a man with stereotypically female anatomy, such as breasts, may be deprived of a benefit or privilege of employment by reason of that nonconforming trait."), *aff'd* 325 Fed. Appx. 492 (9th Cir. 2009); *Tronetti v. Healthnet Lakeshore Hosp.*, No. 03–CV–0375E(SC), 2003 WL 22757935, at *4 (W.D.N.Y. Sept. 26, 2003) (concluding that transsexual plaintiff may state a claim under Title VII "based on

the alleged discrimination for failing to 'act like a man' "). Indeed, in June 2009, Northern District of Georgia Judge Richard W. Story, relying on *Price Waterhouse*, *Smith*, and *Nichols*, held that a transsexual had sufficiently stated a sex discrimination claim under the Equal Protection clause by alleging that she was discriminated against for her failure to conform to gender stereotypes. *Glenn v. Brumby*, 632 F. Supp. 2d 1308, 1316 (N.D. Ga. 2009).

The authority discussed above shows that by January 12, 2010, the date when Plaintiff first attempted to file a charge of sex discrimination with the EEOC, and well within the 180-day period, federal courts had "recognized with near-total uniformity that 'the approach in *Holloway*, *Sommers*, and *Ulane*" – limiting Title VII sex discrimination to just discrimination based on biological sex – "ha[d] been eviscerated' by *Price Waterhouse*[]" and that Title VII plaintiffs, including transsexuals, could bring actionable sex discrimination claims based on gender-nonconformity. *See Glenn*, 663 F.3d at 1318 n.5 (quoting *Smith*, 378 F.3d at 573). As the Sixth Circuit stated in *Smith*, "*Price Waterhouse* … does not make Title VII protection against sex stereotyping conditional or provide any reason to exclude Title VII coverage for non sex-stereotypical behavior simply because the person is a transsexual." 378 F.3d at 574-575; *see also Lopez*, 542 F. Supp. 2d at 660 (" '[T]ranssexuality is not a bar to [the plaintiff's] sex stereotyping claim. Title VII is violated when an employer discriminates against any employee, transsexual or not,

because he or she has failed to act or appear sufficiently masculine or feminine enough for an employer.' ") (quoting *Schroer v. Billington*, 525 F. Supp. 2d 58, 63 (D.D.C. 2007)).  Thus, even if Credit Nation is correct that transsexuals were not members of a protected class based on sex at the time Plaintiff attempted to file her EEOC charge, those discriminated against for failing to conform to gender stereotypes, including transsexuals, were members of such a class under the reasoning of *Price Waterhouse*.  *See Glenn*, 632 F. Supp. 2d at 1316 (applying *Price Waterhouse* and concluding in 2009 that "while 'transsexuals' are not members of a protected class based on sex, those who do not conform to gender stereotypes are members of a protected class based on sex").  By informing Plaintiff otherwise, the EEOC misled Plaintiff as to her rights under Title VII.[8]

In opposition, Credit Nation asserts that the EEOC only recognized that Title VII covers discrimination against transgender or transsexual individuals in April 2012, and therefore the EEOC did not mislead Plaintiff about her rights under Title VII in 2009.  (*See* Doc. 48-1 at 8-10).  But this argument is unpersuasive for two reasons.  First of all, federal courts are the "final arbiter[s] of rights under Title VII, not administrative agencies or tribunals."  *Bembry v. Darrow*, 97 F. Supp. 2d

---

[8] The EEOC admits as much in its amicus brief.  (*See* Doc. 67-1 at 15 ("Thus, in refusing to take the charge, the EEOC misled Chavez into believing that she had no right to challenge her termination and prevented her from satisfying a condition precedent to suit, thus blocking her access to federal court.").

281, 285 (N.D.N.Y. 2000) (citing *Hutchings v. United States Industries, Inc.*, 428 F.2d 303, 313–314 (5th Cir. 1970)), *aff'd* 7 Fed. Appx. 33 (2d Cir. 2001).   As noted above, by January 2010, an overwhelming number of federal courts had concluded that Title VII sex discrimination includes discrimination against an employee, transsexual or not, based on gender non-conformity, making the EEOC investigator's comments to Plaintiff misleading regardless of how the EEOC viewed the applicability of Title VII to transsexuals at that time.   In any event, as the EEOC points out in its amicus brief, EEOC investigators are instructed to accept a charge of discrimination "even if they believe the individual's allegations do not satisfy threshold requirements for coverage under Title VII."  (Doc. 67-1 at 16) (EEOC Compl. Man., Sec. 2: Threshold Issues, 2-1 Overview & n.5 (2000), available   at   http://www.eeoc.gov/laws/guidance/compliance.cfm.).    These instructions are consistent with the Fifth Circuit's conclusion in *McKee v. McDonnell Douglas Technical Services. Co., Inc.*, 700 F.2d 260, 263 (5th Cir. 1983) that EEOC "regulations do not vest Commission officials with discretion to turn away complainants."   *See id.* (applying equitable tolling where an EEOC investigator refused to accept the plaintiff's sex discrimination charge on the grounds that an employee should not be punished for the EEOC's failure to apply duties self-imposed by EEOC regulations).  As such, even if the EEOC did not recognize a Title VII sex discrimination claim for transsexuals based on sex

stereotyping in January 2010, it would still be appropriate to toll the statute of limitations here due to the EEOC's failure to comply with its own regulations and instructions i.e., its failure to accept Plaintiff's sex discrimination charge. *See McKee*, 700 F.2d at 263; *see also Williams v. Owens-Illinois*, Inc., 665 F.2d 918, 923 n. 2 (9th Cir. 1982) ("[A] complainant is not charged with the failure of the EEOC to fulfill procedural requirements imposed upon it by statute. The same principle relieves the complainant from the consequences of a failure of the EEOC to follow the procedures it has imposed upon itself … The complainant is not to be prejudiced by the EEOC's failure to fulfill its duty.") (citations omitted), *cert. denied*, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982).

The record shows that Plaintiff attempted to exhaust her administrative remedies in a timely manner, but was misled about her rights under Title VII by the EEOC's misinformation – that a transsexual could not bring an actionable sex discrimination claim. Under these circumstances, the undersigned concludes that the statute of limitations should be equitably tolled. *See, e.g.*, *Smith v. Baldwin Cnty. Comm'n*, No. 09-0616-CG-M, 2010 WL 2200713, at *3 (S.D. Ala. Mar. 26, 2010) (finding that statute of limitations was equitably tolled where an EEOC investigator provided plaintiff "with misinformation which resulted in Plaintiff's failure to raise a claim of retaliation against Defendant," i.e., he incorrectly told the plaintiff she did not have a retaliation claim).

**B.**    **Merits Of Plaintiff's Title VII Sex Discrimination Claim**

The undersigned now turns to the merits of Plaintiff's Title VII sex discrimination claim.   Credit Nation argues summary judgment is warranted because Plaintiff cannot establish a *prima facie* case of sex discrimination and, even if she could, she cannot show Credit Nation's legitimate, non-discriminatory reason for her termination was pretextual.  (Doc. 48-1 at 15).  Plaintiff, on the other hand, contends that the record contains direct evidence of discrimination and also sufficient evidence to raise a genuine issue of material fact on pretext, thus making an entry of summary judgment inappropriate.  (Doc. 58 at 10).

**1.**    **Analytical Framework For Title VII Discrimination Claims**

A Title VII plaintiff may establish a *prima facie* case of sex discrimination in more than one way.   First, she may produce credible direct evidence of discriminatory intent.  *See Morris v. Emory Clinic*, 402 F.3d 1076, 1081 (11th Cir. 2005); *accord EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).   Direct evidence of discrimination is evidence that, if believed, would establish without inference or presumption that the employer's decision was motivated by discriminatory intent.  *Morris*, 402 F.3d at 1081; *Joe's Stone Crab*, 220 F.3d at 1286.  If a plaintiff produces direct evidence, the burden then shifts to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached in the absence of the

discriminatory intent.  *See Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir. 1982).

More commonly, a Title VII plaintiff may attempt to establish a *prima facie* case of discrimination through circumstantial evidence under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  If a plaintiff presents a *prima facie* case through circumstantial evidence, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Morris*, 402 F.3d at 1081.  If the defendant satisfies this rebuttal burden, the burden shifts to the plaintiff to show that the defendant's "explanation is inadequate, a mere pretext" for discrimination.  *Id.*

In addition, where there is evidence that both legitimate and discriminatory reasons motivated the decision at issue, a plaintiff may seek to prove, through direct or circumstantial evidence, that sex discrimination was a substantial or motivating factor in the employment decision.  *See* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."); *see also Mora v. Jackson Mem'l Found. Inc.*, 597 F.3d 1201, 1203 (11th Cir. 2010) (explaining that, under a mixed-motive approach, a plaintiff must first show "that race or sex discrimination was a motivating or substantial factor in

an employment decision") (citations omitted).  If such a showing is made, "the burden of persuasion shifts to the employer to demonstrate by a preponderance of the evidence that the employer would have made the same decision in the absence of the discriminatory motive."  *Mora*, 597 F.3d at 1203 (citations omitted).

### 2.   **Direct Evidence**

Plaintiff maintains that statements Mr. Torcia made about her gender transition at a November 24, 2009 meeting – that he was very nervous about Plaintiff's situation; did not want Plaintiff to wear a dress to work or have her condition become a problem or hurt his business; and a technician did not want to work at Credit Nation because of Plaintiff's condition – constitute direct evidence of sex discrimination.  (Doc. 58 at 7-10).  Direct evidence is evidence which, if believed, proves the existence of a fact in issue without inference or presumption. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998); *see also Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).  "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  *Carter*, 132 F.3d at 641.  "As a result, 'only the most blatant remarks, whose intent could be nothing other than to discriminate . . .' will constitute direct evidence of discrimination."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (quoting *Earley v. Champion Int'l*

*Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)).   "[R]emarks by non-decision makers or remarks unrelated to the decision making process itself are not direct evidence of discrimination."   *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (citations omitted); *see also Jones v. BE&K Eng'g Co.*, 146 Fed. Appx. 356, 358 (11th Cir. 2005) (unpublished opinion) ("In order to constitute direct evidence, the evidence must directly relate in time and subject to the adverse employment action at issue."); *Bevill v. UAB Walker Coll.*, 62 F. Supp. 2d 1259, 1272 n.10 (N.D. Ala. 1999) ("A few isolated words unrelated to the employee's position or to a relevant hiring, promotion or termination decision will not create direct evidence.") (citing *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998)).

Here, none of Mr. Torcia's statements constitute direct evidence of sex discrimination.  The comments do not specifically address, nor are they directly related to, Mr. Torcia's decision to terminate Plaintiff's employment – indeed, they were made over a month before that decision.   *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227-28 (11th Cir. 2002) (explaining that "[t]o be direct evidence, the remark must indicate that the employment decision in question was motivated by race," and determining that comment by employee's future supervisor that "[w]e'll burn his black ass" was not direct evidence of discrimination because comment was not directly related to employee's

termination); *Standard*, 161 F.3d at 1330 (noting that "remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination").  Plaintiff may be correct that Mr. Torcia's statements reflect a discriminatory attitude, but they do not directly prove that a discriminatory attitude motivated Mr. Torcia's decision to fire Plaintiff.  *See Damon*, 196 F.3d at 1358-59 (explaining that direct evidence "must indicate that the complained-of employment decision was *motivated* by the decision-maker's [discrimination]") (emphasis in original); *see also Carter*, 132 F.3d at 642 (explaining that evidence that the decisionmaker "identified a bias" to another employee "is not the same as saying that [the decisionmaker] exercised that bias in the case of [the plaintiff's] promotion").  To reach that conclusion, the undersigned would have to *infer* that Mr. Torcia's concerns about Plaintiff's transition, first expressed in November 2009, motivated his decision to terminate Plaintiff in January 2010.  *See Damon*, 196 F.3d at 1359 (concluding that the decision makers statement, made immediately after the plaintiff's termination, that "what the company needed was aggressive *young* men like [the plaintiff's replacement] to be promoted" did not constitute direct evidence of age discrimination because "the comment still require[d] [the court] to *infer* that [the decisionmaker's] interest in promoting young men motivated his decision to terminate [the plaintiff]") (emphasis in original); *cf. Glenn*, 663 F.3d at 1320-1321 (concluding that the decision maker's statement that he fired the transgendered

39

plaintiff "based on 'the sheer fact of the transition' " provided "ample direct evidence to support the district court's conclusion that [the decisionmaker] acted on the basis of [the plaintiff's] gender non-conformity").[9]   Because Mr. Torcia's statements require an inferential leap between fact and conclusion, they do not amount to direct evidence of sex discrimination.   *See Carter*, 132 F.3d at 642 ("Direct evidence, by definition, is evidence that does not require such an inferential leap between fact and conclusion.") (citing *Earley*, 907 F.2d at 1081-82); *see also Burrell v. Bd. of Trs. of Georgia Military Coll.*, 125 F.3d 1390, 1393-94 (11th Cir. 1997) (holding that evidence which suggests, but does not prove, a discriminatory motive, is circumstantial evidence by definition).

---

[9] In arguing that this is a direct evidence case, Plaintiff cites *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) for the proposition "that a decision maker's opinion that a transsexual employee dressing in women's clothing was 'inappropriate' and 'unsettling' constitute[s] direct evidence of animus."   (Doc. 58 at 9).   The undersigned disagrees with Plaintiff's reading of *Glenn*.   To be sure, the *Glenn* court relied on those statements in finding direct evidence of discrimination; but the court never stated that those (and similar) remarks always constitute direct evidence of discrimination regardless of whether they are related to the termination decision, as Plaintiff seems to suggest.   To the contrary, the *Glenn* court explicitly noted that the decisionmaker's statements were directly related to Glenn's termination.   *Glenn*, 663 F.3d at 1320 ("Brumby testified at his deposition that he fired Glenn *because* he considered it 'inappropriate' for her to appear at work dressed as a woman and … found it 'unsettling' and 'unnatural' that [she] would appear wearing women's clothing.") (emphasis added).

### 3. <u>Circumstantial Evidence</u>

Having concluded that there is no direct evidence of sex discrimination with respect to Plaintiff's termination, the undersigned must now address whether Plaintiff has established a *prima facie* case of sex discrimination through circumstantial evidence. Ordinarily, in making this determination, courts apply the burden shifting framework established in *McDonnell Douglas*. *See King v. Ferguson Enterprises, Inc.*, 971 F. Supp. 2d 1200, 1210 (N.D. Ga. 2013) ("In the Eleventh Circuit, sex-discrimination claims based on circumstantial evidence are analyzed under the burden-shifting framework established in *McDonnell Douglas* …."). Plaintiff, however, contends that this is a "mixed-motive" case under Section 2000e-2(m) – a provision that allows an employee to prevail on a Title VII claim by establishing that the employee's sex was "a motivating factor for an employment practice" – and appears to argue that a mixed-motive analysis, rather than a *McDonnell Douglas* burden shifting analysis, should govern her sex discrimination claim. (Doc. 58 at 10). Consequently, before reaching the question of whether Plaintiff has demonstrated a *prima facie* case of sex discrimination, the undersigned must first decide the appropriate framework to apply to Plaintiff's Title VII sex discrimination claim.

"In mixed-motive cases, the theory of liability is that the employer was motivated by both legitimate and discriminatory motives in making the challenged

decisions." *Woods v. Austal, U.S.A., LLC*, CIVA. 09-0699-WS-N, 2011 WL 1380054, at *10 (S.D. Ala. Apr. 11, 2011) (citing *Fogg v. Gonzales*, 492 F.3d 447, 453 (D.C. Cir. 2007)).   Under a mixed-motive burden shifting framework, a plaintiff has the initial burden of demonstrating that "sex discrimination was a motivating or substantial factor in an employment decision .…" *Mora*, 597 F.3d at 1203; *see also Lewis v. Metro. Atlanta Rapid Transit Auth.*, 343 Fed. Appx. 450, 455 (11th Cir. 2009) (noting that, in a mixed-motive case, the plaintiff has the initial burden to "present sufficient evidence for a reasonable jury to conclude [her sex] was a motivating factor" in the challenged employment decision); *Rawlinson v. Whitney Nat'l Bank*, 416 F. Supp. 2d 1263, 1267 (M.D. Ala. 2005) (explaining that a mixed-motive analysis begins with examining "whether the plaintiff has proved by a preponderance of the evidence that her [sex] was a motivating factor for the defendant's decision").   If such a showing is made, "the burden of persuasion shifts to the employer to demonstrate by a preponderance of the evidence that the employer would have made the same decision in the absence of the discriminatory motive." *Mora*, 597 F.3d at 1203 (citations omitted).

Plaintiff's argument for why a mixed-motive analysis should apply here is confusing because, although she makes occasional, cursory references to Section 2000e-2(m), she never cites any mixed-motive cases, describes the mixed-motive analytical framework, or attempts to satisfy her initial burden under a mixed-

motive analysis.  (*See* Doc. 58 at 5-10).  Further complicating matters is Plaintiff's thorough discussion of pretext, which includes several citations to cases applying the traditional *McDonnell Douglas* burden shifting framework, rather than a mixed-motive burden shifting analysis.  (*Id.* at 10-24).  As best the undersigned can tell, Plaintiff's only contention for why a mixed-motive analysis, rather than a *McDonnell Douglas* analysis, should apply here is because "[t]his is a 'direct evidence' " case.  (*Id.* at 7).  But as explained above, Plaintiff has presented no direct evidence of sex discrimination with respect to her termination and must instead rely on circumstantial evidence to show a *prima facie* case of discrimination.

In similar circumstances i.e., Title VII discrimination cases relying on circumstantial evidence, lower courts in this Circuit have concluded "that the *McDonnell Douglas* analysis is applicable in all circumstantial cases, regardless of whether they are single-motive or mixed-motive in nature."  *Woods*, 2011 WL 1380054, at *10; *see also Thomas v. Bed Bath & Beyond, Inc.*, 508 F. Supp. 2d 1264, 1274 n.10 (N.D. Ga. 2007) ("The traditional *McDonnell Douglas–Burdine* framework is broad enough to encompass a mixed motive claim."); *Bozeman v. Per-Se Techns., Inc.*, 456 F. Supp. 2d 1282, 1338 n.143 (N.D. Ga. 2006) (applying *McDonnell Douglas* to Title VII mixed-motive claim); *Rawlinson*, 416 F. Supp. 2d at 1268 (applying *McDonnell Douglas* to determine whether the plaintiff had

shown by a preponderance of the evidence that her race was a motivating factor for challenged employment decisions); *Herawi v. State of Alabama Dep't of Forensic Sciences*, 311 F. Supp. 2d 1335, 1346 (M.D. Ala. 2004) (recognizing "continued usefulness of *McDonnell Douglas* to trial courts, in either single- or mixed-motive cases based on circumstantial evidence, for assessing Title VII liability").  Plaintiff provides no persuasive arguments – or for that matter, any arguments – for why the *McDonnell Douglas* framework should not apply to her circumstantial evidence case.

In sum, although Plaintiff suggests that this is a mixed-motive case, she does not apply a mixed-motive analysis to her Title VII claim or cite any mixed-motive cases to support her position.  Her only contention for why *McDonnell Douglas* should not apply here is because there is direct evidence showing that "discriminatory animus motivated [Mr. Torcia's] decision, in whole or in part, to terminate [Plaintiff]."  (Doc. 58 at 10).  Yet Plaintiff has not identified any direct evidence of discrimination.  Because Plaintiff has not offered any arguments for why a mixed-motive analysis should apply to her circumstantial evidence case, and because there is substantial authority from this circuit that *McDonnell Douglas* applies to circumstantial mixed-motive cases, the undersigned will analyze Plaintiff's sex discrimination claim using the burden shifting framework set forth in *McDonnell Douglas*.

44

### a.      <u>Plaintiff's *Prima Facie* Case</u>

Credit Nation asserts that Plaintiff has failed to establish a *prima facie* case of sex discrimination under *McDonnell Douglas* because she has not demonstrated that she was a member of a protected class or that Credit Nation treated similarly situated employees more favorably.  (Doc. 48-1 at 13).  In general, to establish a *prima facie* case of sex discrimination using the *McDonnell Douglas* framework, "a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably."  *Curtis v. Broward Cnty.*, 292 Fed. Appx. 882, 883 (11th Cir. 2008) (unpublished decision) (citing *Maynard v. Bd. Of Regents of Div. of Univs. Of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003)).  A plaintiff can also satisfy the fourth element by showing that she was replaced by someone outside her protected class.  *See Hinson v. Clinch Cnty. Bd. of Ed.*, 231 F.3d 821, 828 (11th Cir. 2000).  These formulations are not exhaustive, however.  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  *Holifield*, 115 F.3d at 1562; *see also Pinder v. John Marshall Law Sch., LLC*, No. 1:12-cv-03300-WSD, 2014 WL 2858658, at *4 (N.D. Ga. June 23, 2014) ("The Supreme Court has repeatedly stated that the plaintiff's burden to establish a *prima facie* case of discrimination is

not onerous, and it can be demonstrated in numerous ways.") (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

Here, Plaintiff has presented evidence that she was qualified for her position, that she began the process to transition from male to female, including presenting herself as a female, undergoing gender transition surgeries, and wearing dresses, and informed her employer that she was making that transition.  (Chavez Dep. at 41-42).  She has also presented evidence that Mr. Torcia told her at a November 24, 2009 meeting that he was very nervous about her situation; that he did not want her to wear a dress to work because it made other personnel nervous, or have her condition become a problem or hurt his business; and that a technician did not want to work at Credit Nation because of her condition.  (*Id.* at 81-85).  While those statements do not constitute direct evidence of discrimination, the undersigned finds that they are "adequate to permit an inference of discrimination," *Holifield*, 115 F.3d at 1562, and sufficient to shift the burden to Credit Nation of articulating a legitimate, non-discriminatory reason for its actions. *See, e.g.*, *Herawi*, 311 F. Supp. 2d at 1347 (concluding that supervisor's alleged comments about the plaintiff's ancestry were sufficient to create the plaintiff's *prima facie* case where the plaintiff failed to identify a comparator or present evidence about her replacement); *Dickson v. Amoco Performance Prods.*, 845 F. Supp. 1565, 1569-70 (N.D. Ga. 1994) (holding that evidence of isolated and stray

remarks about a protected characteristic are sufficient to enable a plaintiff to make out a *prima facie* case of discrimination).

### b.      Legitimate, Non-Discriminatory Reason For The Employment Decision

Since Plaintiff presented a *prima facie* case of discrimination through circumstantial evidence, the burden now shifts to Credit Nation to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  *Morris*, 402 F.3d at 1081. The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion. *Standard*, 161 F.3d at 1331.  This burden is "exceedingly light."  *Turnes v. Amsouth Bank, N.A.*, 36 F.3d 1057, 1060-61 (11th Cir. 1994) (internal quotation omitted).  Credit Nation maintains that it fired Plaintiff for "[s]leeping while on the clock on company time."  (Doc. 60-16 at 2; Weston Dep. at 65; Doc. 48-1 at 15). The undersigned finds that Credit Nation has met its "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for terminating Plaintiff.

### c.      Pretext

Because Credit Nation articulated a legitimate, non-discriminatory reason for terminating Plaintiff, to survive summary judgment, Plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse

employment decision." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (11th Cir. 1997)).  The court's role at this juncture is to "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (internal quotation omitted).  In making the required pretext showing, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer."  *Chapman*, 229 F.3d at 1030.  Rather, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.*

To consider the issue of pretext appropriately, the undersigned finds it helpful first to review how Plaintiff frames her pretext discussion.  It is undisputed that Plaintiff fell asleep in a customer's car while she was on the clock, and that Credit Nation knew that she had done so.  (Chavez Dep. at 78; Weston Dep. at 74).  Consequently, Plaintiff does not contend that the allegations underlying the termination decision were untrue, or that Credit Nation believed them to be untrue.

(*See generally* Doc. 58).   Plaintiff instead argues that Credit Nation's proffered reason is "a pretext for discrimination" because Mr. Torcia's alleged discriminatory animus was at least a motivating factor in the decision to terminate her.   (*See id.* at 10-11).   The undersigned must therefore determine whether Plaintiff has created a genuine issue of material fact as to whether her failure to conform to gender stereotypes was a motivating or substantial factor in Credit Nation's decision to terminate her.

The undersigned first considers the statements Mr. Torcia allegedly made in November 2009 about Plaintiff's gender transition i.e., that he was very nervous about Plaintiff's situation; that he did not want Plaintiff to wear a dress to work because it made other personnel nervous, or have her condition become a problem or hurt his business; and that a technician did not want to work at Credit Nation because of Plaintiff's condition.   (Chavez Dep. at 81-85).   Although not direct evidence of sex discrimination, comments like these – isolated and unrelated to the challenged employment decision – may contribute to a circumstantial case for pretext.   *See Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (explaining that isolated remarks unrelated to an employment decision "can contribute to a circumstantial case for pretext"); *see also Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998) (same).   But discriminatory comments alone usually

will not to be sufficient to establish a triable issue of fact "absent some additional evidence supporting a finding of pretext." *Scott*, 295 F.3d at 1229.

For example, in *Ross*, the plaintiff (an African-American) worked at a furniture store as a delivery manager.  146 F.3d at 1288.  Observing that customer tips were slowing down the delivery of furniture, the plaintiff made a tip box and placed it on the loading dock.  *Id.*  A short time later, the defendant terminated the plaintiff for soliciting tips.  *Id.*  On the issue of pretext, the plaintiff presented evidence that his supervisor had also received tips from customers, and that his supervisor and another employee had made racist comments long before his termination.  *Id.* at 1291-1292.  In analyzing pretext, the Eleventh Circuit explicitly noted that the discriminatory comments had to be "read in conjunction with the entire record" and "considered together with" the other evidence in the case.  *Id.*  Applying that standard, the court held that the discriminatory comments "considered together with the fact that [the supervisor] had received tips, support the jury's rejecting [the defendant's] proffered explanation for firing [the plaintiff]."  *Id.* at 1292.

In *Rojas*, the plaintiff was terminated from her veterinary assistant position for performance reasons, according to her employer.  285 F.3d at 1341.  To prove sex discrimination, the plaintiff offered only one piece of evidence that was arguably persuasive in establishing pretext: a sexist comment made by the

50

plaintiff's immediate supervisor to (and concerning) another female employee that was entirely unrelated to the plaintiff's termination. *Id.* at 1342. On these facts, the Eleventh Circuit distinguished *Ross*, asserting:

> The facts of *Ross*, however, are clearly distinguishable. In *Ross,* fairly strong additional evidence supported a finding of pretext (specifically, that the supervisor who had fired plaintiff had been engaged in the same activity for which plaintiff was fired). But no such additional evidence exists here. The *Ross* court, in fact, explicitly noted that the evidence relating to the discriminatory comments had to be "read in conjunction with the entire record" and "considered together with" the other evidence in the case. Because [the] alleged comment was ... an isolated comment, unrelated to the decision to fire Rojas, it, alone, is insufficient to establish a material fact on pretext.

*Id.* at 1343.

*Ross* and *Rojas* teach that isolated discriminatory comments unrelated to the challenged employment decision "may contribute to a circumstantial case for pretext … [but] will usually not be sufficient absent some additional evidence supporting a finding of pretext." *Scott*, 295 F.3d at 1229 (applying *Ross* and *Rojas* and concluding that, "[w]ithout additional persuasive evidence of pretext," an employee's statement about Plaintiff – "We'll burn his black ass" – was, standing alone, "insufficient to create an issue of fact on pretext"); *see also Dorrego v. Public Health Trust*, 293 F. Supp. 2d 1274, 1287 (S.D. Fla. 2003) (derogatory comments about Hispanic workers made by decisionmaker were not sufficient to create issue of fact as to pretext where there was no additional persuasive evidence

of pretext). Thus, the undersigned examines whether, given the entire record before the Court, Mr. Torcia's comments constitute evidence of pretext sufficient to create a triable issue of fact.

First, the Court considers whether Plaintiff has produced "additional evidence supporting a finding of pretext." *Scott*, 295 F.3d at 1229. In addition to Mr. Torcia's November 2009 remarks, Plaintiff claims that the following pieces of evidence expose weaknesses in Credit Nation's proffered reason for terminating her and establish a triable issue on pretext: (1) "circumstances prior to the offense suggesting that the decision maker, James Torcia, was looking for a reasons to terminate Plaintiff"; (2) "circumstances at the time of the offense suggesting that the Plaintiff's offense was seen by [Credit Nation's] managers as availing a pretext"; (3) "[Credit Nation's] failure to follow its own procedures"; (4) "post-hoc manufacturing of a zero-tolerance policy"; and (5) "changing rationales for termination." (Doc. 58 at 11). For the reasons discussed below, however, the undersigned finds Plaintiff's evidence insufficient to establish a genuine issue of material fact as to pretext and therefore summary judgment is due to be granted on Plaintiff's Title VII sex discrimination claim.

### (1) Circumstances Before Plaintiff's Termination

Plaintiff points to three events prior to her termination she believes raise a triable issue of fact on pretext: (1) Mrs. Weston stating to Plaintiff that she needed

"to tone it down because Mr. Torcia didn't like" the discussions she was having with other technicians; (2) Credit Nation prohibiting Plaintiff from using "the female bathroom in the waiting area"; and (3) Mr. McManus sending an e-mail to Mrs. Weston and Mr. Torcia warning of a potential breaking point with Plaintiff. (Doc. 58 at 12-13).

First, as to Mrs. Weston's statement, the undersigned notes that the strength of this evidence is significantly undercut by Plaintiff's conflicting testimony. Plaintiff initially testified that, when Mrs. Weston instructed her to tone it down, Mrs. Weston did not "specify" whether Mr. Torcia "said something to [Mrs. Weston]" about Plaintiff's behavior, but that it is Plaintiff's "supposition" that he did. (Chavez Dep. at 47). Later in her deposition, however, Plaintiff testified that Mrs. Weston "told [her] to tone it down *because Mr. Torcia didn't like*" the discussions she was having with other technicians about her transition. (*Id.* at 131) (emphasis added).[10] Further undermining Plaintiff's position is the fact that Mrs. Weston never testified at her deposition that Mr. Torcia told her that he disliked Plaintiff's gender transition conversations. (Weston Dep. at 34).

---

[10] Going even further, Plaintiff asserts in her declaration that Mrs. Weston told her to " 'tone it down,' and to be 'very careful' because the owner, Jim Torchia [sic] 'didn't like' the situation regarding [her] gender transition after he had been informed of it." (Chavez Decl. at ¶ 37).

Regardless of the conflicting testimony, even if the undersigned assumes Mrs. Weston told Plaintiff that Mr. Torcia disliked the transition conversations she was having with other technicians, it does not support a finding of pretext. According to Mrs. Weston's undisputed testimony, she told Plaintiff to tone down the transition conversations (i.e., the conversations that Mr. Torcia allegedly disliked) because she had received several complaints about Plaintiff "visiting the other technicians' stalls" and "talking [] about surgeries that she was going to be undergoing," including breast augmentation. (Weston Dep. at 34). Plaintiff points to no authority – and the undersigned is unaware of any – that prohibits an employer from asking an employee to abide by certain rules i.e., to refrain from visiting other employees during work hours and talking about breasts and surgeries. In addition, that Mr. Torcia disapproved of Plaintiff discussing her surgeries and breasts *during work hours* does not insinuate that he harbored an animus against Plaintiff for failing to conform to gender stereotypes. The undersigned thus concludes that Mrs. Weston's statement does not raise a genuine issue of fact on pretext.

Plaintiff next contends that Credit Nation's decision to prohibit her from using "the female bathroom in the waiting area" constitutes evidence of pretext. (Doc. 58 at 13). But this argument fails for a number of reasons. First of all, it is factually inaccurate. As Mr. Nuhibian, Mrs. Weston, and even *Plaintiff* testified,

the bathroom located in Credit Nation's waiting area is a unisex restroom, not a female restroom.  (Chavez Dep. at 73-74; Nuhibian Dep. at 113; Weston Dep. at 53).    Second,  Credit  Nation  treated  all  similarly  situated  employees  i.e., technicians,  the  same  with  respect  to  the  unisex  bathroom:  it  prohibited  all technicians  from  using  the  unisex  bathroom  and  required  them  to  use  the technician's bathroom instead because the technician's bathroom had "special soap in there" that helps remove grease off of the technician's hands (*see* Chavez Dep. at 74), and because technicians wear "dirty clothes" and accumulate oil and grease on their shoes.  (Nuhibian Dep. at 114; *see also* Weston Dep. at 52).  Finally, Plaintiff testified that she was upset about not being able use the unisex bathroom not  because  she  felt  discriminated  against,  but  rather  because  she  believed  her clothes were going to get ruined in the "dirty and grimy" technician's bathroom "and [she] didn't like that."  (Chavez Dep. at 73).

Plaintiff final argument points to language John McManus, an attorney who handled legal matters for Credit Nation, used in an e-mail to Mrs. Weston and Mr. Torcia.    (Doc.  58  at  13).    Mr.  McManus  wrote  the  e-mail  after  receiving  a correspondence from Mrs. Weston, who was looking for help in regards to a situation she did not "know how to handle" i.e., Plaintiff's request to use the unisex bathroom.  (Doc. 60-8 at 2-3).  Mrs. Weston informed Mr. McManus that there are two bathrooms at Credit Nation – a technicians bathroom and a unisex bathroom

for customers and office personnel; that technicians are required to have their own restroom due to the grease and oil that accumulates on the bottom of their shoes and clothes; that parts employees and office personnel can use the unisex bathroom because, unlike technicians, they do not have grease on their shoes; and that when Plaintiff learned about a female parts employee using the unisex bathroom, she claimed discrimination. (*See id.*). In response, Mr. McManus wrote "[t]omorrow will bring more issues and I think this will get to a breaking point before very long. Just have the management focus on work and performance of required duties and the other issues should be written up one at a time." (*Id.*).

Plaintiff draws several conclusions from these statements – the breaking point refers to termination, and Plaintiff was terminated a short time after the e-mail was written, indicating that Credit Nation was searching for ways to terminate her; and "[t]he email abjures Ms. Weston and Mr Torcia 'to focus on work and performance of required duties of [Plaintiff], indicating a search for work deficiencies" – in arguing that the substance of Mr. McManus's e-mail establishes "that Credit Nation was looking to find reasons to terminate [Plaintiff]." (Doc. 58 at 14). But none of Plaintiff's conclusions are convincing. In the first place, the undersigned fails to see – and the Plaintiff fails to persuasively explain – how Mr. McManus's belief that an unexplained breaking point would eventually be reached establishes that *Credit Nation* was actively searching for reasons to terminate

Plaintiff's employment.  Plaintiff's only argument on this point is that she was terminated shortly after the e-mail was written (*see id.*), but the temporal proximity between the two events is not suggestive of discrimination, particularly considering that it is undisputed that Plaintiff slept on the clock while on company time (*see* Chavez Dep. at 78) and that Credit Nation similarly terminated another employee for the same offense.  (Weston Dep. at 112).  As for Mr. McManus's statement to focus on work and performance of required duties, Plaintiff speculates that this remark reveals Credit Nation's intent to search for work deficiencies.  (Doc. 58 at 14).  But there is no evidence to support that assumption.  Although Plaintiff states in passing that her work and personal situation were "subjected to additional scrutiny," (*id.* at 13), (the assumption being that Credit Nation scrutinized Plaintiff more heavily because it was trying to find a reason to terminate her), she provides no specific evidence to support that argument and instead relies solely on conclusory assertions, which are plainly insufficient to establish an issue of fact. *See Earley*, 907 F.2d at 1081 ("To survive summary judgment, the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice.").

More importantly, Plaintiff provides no arguments supporting a conclusion that Credit Nation searched for reasons to terminate her due to her failure to

conform to gender stereotypes.  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010) (explaining that the plaintiff's burden at summary judgment "is to show not just that [the defendant's] proffered reasons for firing her were ill-founded but that unlawful discrimination was the true reason); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1291 (11th Cir. 2005) (explaining that the plaintiff failed to establish pretext because, even if the attorney's statement to the defendant that "this might be what we have been waiting on to move toward taking action on [the plaintiff]" established that the defendant was looking to take action against the plaintiff, the plaintiff failed to show that the defendant was motivated by race discrimination).  By Plaintiff's own admission, Credit Nation "allowed [her] to go to … doctor's appointments … do[] electrolysis almost every morning … [and] take[] excessive unpaid time to attend these doctor and therapist appointments and such."  (Chavez Dep. at 61).  More significant, only weeks before the incident regarding the unisex bathroom occurred, Credit Nation provided Plaintiff with two weeks paid vacation time (even though she was only entitled to one week) for her gender transition surgery because, as Mr. Torcia testified, it wanted to "be accommodating to the [gender transition] procedures."  (Torcia Dep. at 59).  Credit Nation's decisions to allow Plaintiff to take "excessive unpaid time to attend doctor and therapists appointments" and to provide Plaintiff with two weeks of paid leave time to

*accommodate her gender transition surgery* are inconsistent with the unsupported notion that Credit Nation searched for reasons to terminate Plaintiff *because of her gender transition*.  Mr. McManus's e-mail therefore does not establish a genuine issue of fact on pretext.

### (2)    Circumstances Surrounding Plaintiff's Termination

Plaintiff contends that "[t]he circumstances under which [she] was found to be sleeping … call into question [Credit Nation's] belief in the truth of its rationale" for terminating her, i.e., that it terminated Plaintiff for sleeping on the job and that it believed sleeping on the job was a terminable offense.  (Doc. 58 at 14-15).[11]  To support that argument, Plaintiff first describes in great length the weather and working conditions she encountered on January 8, 2010: "[t]he temperature that morning was 16 degrees Fahrenheit … and it was extremely cold"; "[a]uthorities were calling for people to not travel on the roads because of icy conditions;" "the parts necessary to being the repairs had not yet arrived, and so there was no work for her to do"; "[b]ecause it was so cold, and believing a weather day would be called, she waited to put on her uniform shirt"; "[Plaintiff]

---

[11] Plaintiff actually states in her brief that "[t]he circumstances under which [she] was found to be sleeping … call into question [Credit Nation's] belief in the truth of its rationale for termination – violation of [Credit Nation's] alleged zero tolerance policy for sleeping."  (Doc. 58 at 14, 15).  But, as the undersigned explains in greater detail below, Mr. Torcia, the decision maker, did not state that Plaintiff was terminated for violating a "zero tolerance policy" for sleeping.

was not hiding with an intent to sleep … [s]he unintentionally fell asleep." (Doc. 58 at 15-16).  Plaintiff appears to be challenging the wisdom or fairness of Credit Nation's decision to terminate her for sleeping on the job when she did so for what she identifies as good reasons – it was cold and there was no work to do.  But courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, [the] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon*, 196 F.3d at 1361 (citation omitted); *see also Alvarez*, 610 F.3d at 1266 ("We do not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (explaining that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason").  Credit Nation had the right to determine whether Plaintiff was justified in sleeping on the job on company time and to take such actions as it saw fit after weighing the facts.

In the alternative, Plaintiff asserts that Mr. Nuhibian, Mr. Weston, and Mr. Torcia did not reasonably believe that sleeping on the job was a serious work rule violation subject to termination because, if they did, Mr. Nuhibian and Mr. Weston

would not have allowed Plaintiff to remain sleeping for over 45 minutes.  (Doc. 58 at 16-17).[12]  The undersigned is not persuaded.  Even assuming that Mr. Nuhibian and Mr. Weston did not believe sleeping on the job was a terminable offense, and pursuant to that belief did not wake Plaintiff up, that fact is completely irrelevant to the pretext analysis.  The Eleventh Circuit has made clear that "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the *decision maker's* head." *Alvarez*, 610 F.3d at 1266 (emphasis added) (citing *Holifield*, 115 F.3d at 1565); *see also King v. Ferguson Enters., Inc.*, 971 F. Supp. 2d 1200, 1218 (N.D. Ga. 2013) ("To put the point bluntly, '[t]he inquiry into pretext centers on the [decisionmaker's] beliefs, ..., not on reality as it exists outside of the decision maker's head.") (quoting *Alvarez*, 610 F.3d at 1266); *Aldabblan v. Festive Pizza, Ltd.*, 380 F. Supp. 2d 1345, 1353 (S.D. Fla. 2005) ("In conducting a pretext analysis, the Court should focus on the perception of the decision-maker.")

---

[12] Plaintiff mentions in passing the fact that, instead of waking her up when he saw her sleeping, Mr. Nuhibian took a photograph of Plaintiff sleeping in the back of a customer's vehicle.  (Doc. 58 at 16).  To the extent that Plaintiff argues that this is evidence of pretext, the undersigned finds that argument meritless.  On deposition, Mr. Nuhibian provided a non-discriminatory reason for his actions: he testified that he took a picture of Plaintiff because, on past occasions when he said that a technician violated a rule, the technician would just deny any wrongdoing, which "ma[de him] look bad" – by taking a picture, he explained, he could actually provide evidence to "back up what [he] saw."  (Nuhibian Dep. at 48, 55).  Plaintiff provides no evidence to contradict this statement or to show that a discriminatory animus more likely than not motivated Mr. Nuhibian.

(citations omitted).   Consequently, to demonstrate pretext here, Plaintiff must establish that *Mr. Torcia* (the decisionmaker) did not reasonably believe that sleeping on the job was a serious work rule violation subject to termination yet terminated Plaintiff anyway.  *See Wiggins v. Sec'y, Dep't of Army*, 520 Fed. Appx. 799, 801 (11th Cir. 2013) (unpublished opinion) ("When considering whether the basis for an employee's termination was merely pretext, the proper inquiry is whether the decisionmaker believed the employee was guilty of misconduct and whether that belief was the reason for the employee's discharge.") (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

Plaintiff fails to make this showing.  The only evidence on this point that Plaintiff presents is that Mr. Nuhibian and Mr. Weston allowed Plaintiff to remain sleeping for nearly 45 minutes.  (Doc. 58 at 17-18).  But the fact that Mr. Nuhibian and Mr. Weston did not wake Plaintiff up (the argument being that if they felt sleeping on the job was a serious offense, they would have) standing alone says nothing about whether *Mr. Torcia* believed that sleeping on the job was a serious work infraction.  And Mr. Torcia's undisputed testimony reveals that he deemed sleeping on the job to be a terminable offense: he testified that he learned about the January 8, 2010 incident and the fact that a picture had been taken of Plaintiff sleeping from a conversation he had with Mrs. Weston, and he decided to terminate Plaintiff during that discussion because he thought Plaintiff's actions

represented a severe violation of Credit Nation's rules.  (Torcia Dep. at 29-31, 83-84).   Furthermore, Credit Nation similarly terminated another employee for sleeping on the clock.  (Weston Dep. at 112).  In light of this evidence, Plaintiff's argument is insufficient to establish a triable issue of fact on pretext.[13]

### (3)      Failure To Follow Discipline Procedures

Next, Plaintiff submits that a reasonable jury could find Credit Nation's proffered reason pretextual because Credit Nation failed to follow its progressive discipline policy when it terminated Plaintiff.  (Doc. 58 at 19).  The undersigned disagrees.   "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006); *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) ("Departures from normal procedures may be suggestive of

---

[13] Plaintiff also asserts that Mr. Nuhibian "testified at deposition that he believed that his actions were intended to 'run [Ms. Chavez] out of [C]redit [N]ation.' " (Doc. 58 at 17 n.8 (citing Pl. SMF at ¶ 30).  But this is simply a misrepresentation of the record.  Mr. Nuhibian never made such a statement on deposition; instead, he told Plaintiff that he "kn[ew] for a fact [she was] run out of credit nation" via an internet message on the website findashemalelover.com weeks after he was terminated from Credit Nation.  (Doc. 60-13 at 2-3).  Even assuming that such a statement is admissible, it does not provide evidence of pretext.  Mr. Nuhibian testified at his deposition that he never felt Credit Nation was looking for a way to terminate Plaintiff; that no one at Credit Nation ever said anything to him about terminating Plaintiff; and that his statement – "[I] know for a fact you were run out of credit nation" – simply referred to the fact that he was the one who took Plaintiff's picture and ultimately got her fired and that it had nothing to do with whether Credit Nation set Plaintiff up or looked for ways to terminate her. (Nuhibian Dep. at 31-33).

discrimination."). "[W]hen an employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in h[er] case." *Ritchie v. Indus. Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011) (unpublished opinion) (citing *Morris v. City of Chillicothe*, 512 F.3d 1013, 1020 (8th Cir. 2008) for the proposition that "[d]eviance from a progressive discipline policy can be evidence of pretext"). Critically, however, "if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext." *Ritchie*, 426 Fed. Appx. at 873; *see also Morris*, 512 F.3d at 1020 (holding that the plaintiff failed to establish pretext based on a failure to follow a progressive discipline policy because the "department's employee manual and related documents specifically state[d] that the department [was] not bound by any number of warnings and that it c[ould] fire at-will employees without warning if necessary"); *Coleman v. Alabama State Univ.*, 904 F. Supp. 2d 1245, 1259 (M.D. Ala. 2012) (finding no evidence of pretext where the employer had discretion in applying disciplinary policy).

Here, although Credit Nation has an established progressive discipline policy, Credit Nation's employee handbook specifically reserves Credit Nation's "right to terminate employment at will, with or without cause or advance notice"; explains that Credit Nation "may use progressive discipline at its discretion"; and states that there may be circumstances (serious employee problems) where one or

more steps in the policy may be skipped.  (Doc. 60-14 at 43).  Given the broad discretion Credit Nation has in applying its progressive discipline policy, its decision to terminate Plaintiff rather than impose a less severe discipline does not establish pretext.  *See Ritchie*, 426 Fed. Appx. at 873; *see also Morris*, 512 F.3d at 1020; *Vergers v. Am. Vulkan Corp.*, 8:10-CV-2164-T-24, 2012 WL 95306, at *8 (M.D. Fla. Jan. 12, 2012) (finding no evidence of pretext where a progressive discipline policy (substantially similar to the one here) afforded the employer discretion to skip steps in the process).  Additionally, the employee handbook contemplates that certain offenses, including theft, may result in immediate discharge, (Doc. 60-14 at 43-44), and Mr. Torcia testified that he believes sleeping on the clock constitutes theft.  (*See* Torcia Dep. at 30-31).  Title VII does "not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules," *see Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999), and Plaintiff provides no evidence to suggest that Mr. Torcia interpreted Credit Nation's rules in a discriminatory manner or afforded other employees accused of similar misconduct the benefit of progressive discipline.  *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (holding that the plaintiff could not establish pretext based on employer's failure to follow its discipline policy because the plaintiff did not offer any evidence that the policy was rigorously enforced, and because the policy contemplated immediate

termination for certain offenses).  On the contrary, the record reveals that Credit Nation terminated another employee who was similarly found sleeping on the job, even though he did not have any previous disciplinary issues.  (*See* Weston Dep. at 112).  Plaintiff therefore has failed to establish pretext through Credit Nation's purported failure to follow its progressive discipline policy.

### (4)   **Post-Hoc Rationalization**

Plaintiff argues that "Credit Nation has engaged in *post-hoc* manufacturing of a zero-tolerance policy" for sleeping on the job because Credit Nation states in its summary judgment brief that it "has a zero tolerance policy for sleeping on the job as evidenced by the two terminations that followed episodes of sleeping." (Doc. 58 at 20-21; Doc. 48-1 at 14).  Plaintiff essentially contends that Credit Nation is attempting to bolster its reason for terminating her by citing a non-existent "zero-tolerance policy," and that its reference to such a policy evidences a shifting of its reasons for the termination decision.  (Doc. 58 at 20-21).  The undersigned disagrees.

"Evidence of a post-hoc attempt to justify an employment decision may be evidence of pretext."  *Keaton v. Cobb Cnty.*, 545 F. Supp. 2d 1275, 1303 (N.D. Ga. 2008) (citations omitted); *see also Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1496 (11th Cir. 1987).  In *Rosenfield*, the plaintiff sued his employer for age discrimination after he was terminated for poor work

performance.  827 F.2d at 1494.  To establish pretext, the plaintiff pointed out that his employer's proffered reason relied on evidence obtained after the termination decision.  *Id.* at 1496-1497.  The Eleventh Circuit sided with the plaintiff and concluded that the employer's explanation was pretextual because "much of [the employer's] evidence of … poor work performance" was obtained after the termination decision had been made. *Id.* at 1496.

Similarly, in *Keaton*, the court found that a county government's post-hoc attempt to justify a promotion decision constituted evidence of pretext.  In that case, the plaintiff sued the county for racial discrimination after it promoted another employee to an administrative supervisor position.  *Keaton*, 545 F. Supp. 2d at 1282, 1285.  After the promotion decision had been made, and after the plaintiff had complained about the decision, the county sought further documentation from the promoted employee concerning her supervisory experience, a factor the county had taken into account in making its promotion decision.  545 F. Supp. 2d at 1287, 1303-1304.  Relying on *Rosenfield*, the court held "that the after-the-fact decision to obtain documentation provide[d] some evidence of pretext" with respect to the promotion decision.  *Id.* at 1304.

The present case differs dramatically from *Rosenfield* and *Keaton*.  The Monday after Plaintiff was found sleeping during work hours, Mrs. Weston told her that "[she] had been observed sleeping, that [sleeping on the job on company

time] was against company policy, and [that she] was being terminated for it."
(Chavez Dep. at 106). In addition, Mr. Torcia (the final decision maker) testified
on deposition that he terminated Plaintiff for sleeping on the job on company time,
and Plaintiff's separation notice, which she received on the day of her termination,
further confirms that testimony. (Torcia Dep. at 29-31, 81-83; Doc. 60-16 at 2
(stating that Plaintiff was terminated for "[s]leeping while on the clock on
company time.")). Thus, Credit Nation has consistently stated that the reason for
the termination decision is the fact that Plaintiff slept on the job on company time.
Unlike *Rosenfield* and *Keaton*, there is no evidence here that Mr. Torcia sought to
bolster his termination decision after the fact with evidence of any additional
reasons, including a purported "zero-tolerance policy" for sleeping – in fact, there
is no evidence that Mr. Torcia ever mentioned, much less relied, on such a policy.
Instead, Mr. Torcia testified that he considered Plaintiff's actions to be a serious
offense, i.e., theft, warranting the termination of her employment. (Torcia Dep. at
29-31, 83).

Plaintiff's only support for her argument comes from a statement in Credit
Nation's summary judgment brief that it "has a zero tolerance policy for sleeping
on the job as evidenced by the two terminations that followed episodes of
sleeping." (Doc. 58 at 20-21; Doc. 48-1 at 14). Putting aside the fact that this
statement says nothing about whether Credit Nation terminated Plaintiff pursuant

to a zero-tolerance policy, the pretext analysis focuses on the reasons the decisionmaker claims to have relied on, not on the reasons proffered by counsel. *See Burdine*, 450 U.S. at 255 n.9 ("[D]efendant cannot meet its burden merely . . . by argument of counsel."); *see also Bates v. Greyhound Lines, Inc.*, 81 F. Supp. 2d 1292, 1302 (N.D. Fla. 2000) ("A reason that a company or its lawyers conjures after-the-fact says nothing about whether a decision was impermissibly based on racial discrimination."), *aff'd*, 239 F.3d 369 (11th Cir. 2000).  Since there is no evidence here that Mr. Torcia relied on a zero-tolerance policy for sleeping when he terminated Plaintiff, the undersigned concludes that Plaintiff's argument does not raise a genuine issue of fact on pretext.

### (5)   <u>Inconsistent Reasons For Termination</u>

Finally, Plaintiff claims that, although Credit Nation initially stated it terminated Plaintiff for sleeping while on the clock on company time, it has subsequently provided shifting reasons for the termination decision.  (Doc. 58 at 21-22).  "[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."  *Keaton*, 545 F. Supp. 2d at 1305 (quoting *Hurlbert*, 439 F.3d at 1299).  "An employer is permitted, however, to elaborate on its reasons for taking an employment action."  *Id.* (citing *Standard*, 161 F.3d at 1332 for the proposition that a more detailed explanation for a general reason is insufficient to establish pretext).  "Also, an

additional, but undisclosed, reason for an employment decision does not establish pretext." *Id.* (citing *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998)).

Plaintiff first asserts that Credit Nation provided inconsistent reasons for her termination at the Employment Security Agency Board hearing by asserting that it terminated her for sleeping on the clock and also for a disciplinary warning on November 17, 2009, and for failure to be in uniform by 8:00 a.m. (Doc. 58 at 22). But the record does not support Plaintiff's contention. Although Credit Nation discussed the November 17, 2009 disciplinary warning at the board hearing, it only did so in order to explain to the hearing officer that other Credit Nation employees, and not just Plaintiff, received disciplinary write-ups. (Doc. 60-11 at 36 ("[T]here were a couple of write-ups for, uh [Plaintiff] and on other things, but other employees are written up as well … So it's not — it wasn't one-sided as far as her write-ups.")). Indeed, immediately after explaining Plaintiff's previous disciplinary problems, Mrs. Weston (testifying on behalf of Credit Nation) summed up the purpose of the hearing: "this is about [Plaintiff] being terminated because of sleeping on the clock." (*Id.*). As to Plaintiff's failure to be in uniform by 8:00 a.m., Credit Nation mentioned this issue only after the hearing officer asked Credit Nation to talk about Plaintiff's "past warnings" (*Id.* at 37) – it never testified at the hearing that it terminated Plaintiff for that reason.

As for the reasons proffered in the summary judgment brief (Plaintiff's two prior disciplinary write-ups, violation of six other work rules, and excessive absences), it bears repeating that the pretext analysis focuses on the reasons the decisionmaker claims to have relied on, not on the reasons proffered by counsel. *See Burdine*, 450 U.S. at 255 n.9; *see also Bates*, 81 F. Supp. 2d at 1302.   As previously noted, Mrs. Weston informed Plaintiff on the day of her termination that she was being terminated because "[sleeping on the job on company time] was against company policy"; Plaintiff's separation notice, which she received on the day of her termination, states that Plaintiff was terminated for "[s]leeping while on the clock on company time"; and Mr. Torcia testified on deposition that he terminated Plaintiff for sleeping on the job on company time.   (Chavez Dep. at 106; Doc. 60-16 at 2; Torcia Dep. at 29-31, 81-83).   Plaintiff points to nothing in the record to rebut that evidence, nor does she demonstrate that Mr. Torcia ever testified to relying on Plaintiff's previous disciplinary warnings, her violation of six other work rules, or her excessive absences in making the termination decision.

In an effort to demonstrate Credit Nation's shifting rationale, Plaintiff points to Credit Nation's May 14, 2012 response to Plaintiff's EEOC Complaint, in which it states that Plaintiff "was fired for sleeping on the job, misusing a customer's property, and failing to wear a uniform."   (Doc. 60-17 at 2).   This evidence, however, does not establish a triable issue on pretext.   At most, Credit Nation's

explanation in its EEOC response is just a further elaboration on why it found Plaintiff's actions (sleeping on the job) particularly egregious – not only was Plaintiff sleeping on the job, but she was also not in uniform and sleeping in a customer's vehicle, rather than working while she was being paid to work.  Such an elaboration is not evidence of pretext.  *See Standard*, 161 F.3d at 1332.  In any event, even if Plaintiff's failure to wear a uniform, and her alleged misuse of customer property, were additional, but undisclosed, reasons for termination, those reasons are not fundamentally inconsistent with Credit Nation's stated reason for her termination i.e., sleeping on the job while on company time, particularly given that all of those reasons relate to the same event – Plaintiff sleeping in the back of a customer's vehicle without her uniform on January 8, 2010.  *See Phillips v. Aaron Rents, Inc.*, 262 Fed. Appx. 202, 210 (11th Cir. 2008) (unpublished per curiam opinion) ("If an employer offers different reasons for terminating an employee, those reasons must be fundamentally inconsistent in order to constitute evidence of pretext.").  In the absence of a conflict between Credit Nation's stated reasons for Plaintiff's termination, the undersigned finds Plaintiff's evidence fails to establish pretext.

Accordingly, the undersigned finds that, even taking Mr. Torcia's November 2009 comments into account, Plaintiff has failed to produce "additional evidence supporting a finding of pretext."  *Scott*, 295 F.3d at 1229.  Mindful of the Eleventh

Circuit's declaration in *Ross* that isolated discriminatory comments unrelated to the challenged employment decision must be "read in conjunction with the entire record" and "considered together with" the other evidence in the case, 146 F.3d at 1288, the undersigned finds that additional evidence further compels the conclusion that no reasonable juror could conclude that Credit Nation was motivated by a discriminatory animus when it terminated Plaintiff.

### (6) <u>Plaintiff's Pretext Evidence In Light Of The Entire Record</u>

By Plaintiff's admission, Mr. and Mrs. Weston were both "extraordinarily kind" to her after they learned in October 2009 about her plan to transition from male to female, and they reassured her that she had "nothing to fear" and that she had "their 100 percent support." (Chavez Dep. at 44). She also testified that all of the service facility employees were incredibly receptive and supportive of her; indeed, "they all said they had no issues with" her transition. (*Id.* at 45-46). After receiving such an overwhelmingly positive reaction from Credit Nation, Plaintiff felt compelled to write an e-mail to the Atlanta Journal Constitution; in it, she explained how "extraordinarily understanding, kind and compassionate" Mr. and Mrs. Weston were after hearing of her transition; how supportive Mr. Torcia was, and how he was "only concerned that [Plaintiff] would be able to continue doing [her] job, and if that was not a concern then [Plaintiff] had nothing to worry about" and how he "made sure that all employees understood the no harassment policy

and that anyone who committed an infraction would be terminated"; and how she "was met with nothing but kindness from all employees [and managers], even the crotchety old southern guys who [she] thought were set in their ways." (Doc. 49-6 at 1-2).

Although Mrs. Weston, just two weeks after learning of Plaintiff's transition, approached Plaintiff and asked her to "tone it down," Mrs. Weston's undisputed testimony reveals that she made this statement after receiving complaints about Plaintiff "visiting the other technicians' stalls" and "talking [] about surgeries that she was going to be undergoing," including breast augmentation, which made some of the other technicians uncomfortable. (Weston Dep. at 34). Furthermore, although Plaintiff complains about the first disciplinary write-up she received after announcing her transition, it is undisputed that the first altercation she had with Randall (for which Plaintiff received her first write-up) started after Plaintiff told Randall he was being dishonest about a car repair. (Chavez Dep. at 48). Moreover, despite Plaintiff's contention that she never received a second disciplinary write-up, it is undisputed that Plaintiff told other technicians she had Mrs. Weston's number and therefore no one could mess with her, which was the reason Credit Nation provided for Plaintiff's second disciplinary write-up. (Chavez Dep. at 48, 61; Doc. 49-7; Weston Dep. at 22). Also, while it may be true that other technicians were upset with Plaintiff after she announced her transition,

they were upset because they "thought that [Plaintiff] was getting special treatment by being able to take time off from work and not having to make it up," (Weston Dep. at 148), not because they harbored a discriminatory animus.

More importantly, even though Mr. Torcia allegedly made discriminatory remarks to Plaintiff on November 24, 2009, the record reflects that, two weeks after purportedly making those statements, Mr. Torcia and Mrs. Weston, on their own initiative, agreed to provide Plaintiff with an additional week of paid leave time for her gender transition surgeries, even though Plaintiff was not entitled to such under Credit Nation's leave policy. (Chavez Dep. at 64-65). When asked why he provided Plaintiff with an additional week of paid leave, Mr. Torcia asserted that he wanted to "be accommodating to the [gender transition] procedures." (Torcia Dep. at 59). Credit Nation further assisted Plaintiff's gender transition by "allow[ing] [her] to go to … doctor's appointments … do[] electrolysis almost every morning … [and] take[] excessive unpaid time to attend these doctor and therapist appointments and such." (Chavez Dep. at 61). Finally, although Plaintiff claims that her termination was based on her gender non-conformity, it is undisputed that on January 8, 2010, she fell asleep in the back of a customer's car while on company time. (*Id.* at 78).

In light of the entire record, and Plaintiff's failure to point to "additional persuasive evidence of pretext," *Scott*, 295 F.3d at 1229, the undersigned finds no

reasonable juror could conclude that Plaintiff's failure to conform to gender stereotypes motivated Credit Nation's decision to terminate her.  Accordingly, the undersigned **RECOMMENDS** that Credit Nation's motion for summary judgment (Doc. 48) be **GRANTED**.

## CONCLUSION

The undersigned **RECOMMENDS** that Credit Nation's motion for summary judgment (Doc. 48) be **GRANTED**.  The Clerk is **DIRECTED** to terminate referral of this matter to the undersigned magistrate judge.

**IT IS SO REPORTED AND RECOMMENDED** this 18th day of July, 2014.

 /s/  J. CLAY FULLER
J. CLAY FULLER
United States Magistrate Judge