# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JENNIFER CHAVEZ,

    **Plaintiff,**

  v.             **1:13-cv-00312-WSD**

CREDIT NATION AUTO SALES,

     **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge J. Clay Fuller's Final

Report and Recommendation ("R&R") [76] on Defendant Credit Nation Auto

Sales's Motion for Summary Judgment [48].

## I. BACKGROUND

### A. Facts[1]

Plaintiff Jennifer Chavez ("Plaintiff") was formerly employed as an

automobile technician at Credit Nation Auto Sales ("Defendant" or "Credit

Nation"). Credit Nation sells and repairs automobiles in Austell, Georgia. In June,

2008, Plaintiff started working at Credit Nation. At that time, Plaintiff was known

---

[1] The facts are taken from the R&R and the record. The Court finds no plain error
in the facts. To the extent that the parties have not objected to any specific facts
determined in the R&R, the Court adopts them. See Garvey v. Vaughn, 993 F.2d
776, 779 n.9 (11th Cir. 1993).

as Louie Chavez and presented as a male.  In the summer of 2009, Plaintiff decided to go through a gender transition because Plaintiff "could no longer run from [her] condition, and Plaintiff "did not want to die having lived a lie."  Chavez Dep. at 37.  Plaintiff sought help from a mental health expert, attended meetings at a transsexual support group, and decided to inform Defendant of the intention to transition from a male to a female.

On October 28, 2009, Plaintiff met with Phil Weston, Plaintiff's immediate supervisor, and Cindy Weston, the Vice President of Credit Nation.  Plaintiff informed them of the intention to transition from a male to a female.  According to Plaintiff, Mr. and Mrs. Weston were both "extraordinarily kind" regarding the decision to transition.  Jim Torcia, the owner of Credit Nation, testified that Plaintiff's decision to transition "did not move the needle for [him]."  Torcia Dep. at 19-20.

After meeting with Mr. and Mrs. Weston, Plaintiff informed Credit Nation's service facility employees regarding Plaintiff's decision to transition from a male to a female.  According to Plaintiff, the service facility employees were supportive of the decision, and "they all said they had no issue" with the transition.  Chavez Dep. at 44-45.  A week after Plaintiff announced the decision to transition, Plaintiff emailed a reporter from the Atlanta Journal-Constitution describing the

2

circumstances of the decision to inform Plaintiff's employer about Plaintiff's

condition and intent to transition.  The reporter previously wrote an article about a

transsexual woman, who had prevailed in a sex discrimination lawsuit against the

transsexual woman's former employer.  Plaintiff stated the following in the email

to the reporter:

> I asked for a meeting with my supervisor and the vice-president of the
> company, after very nervously telling my story, I was surprised to find
> that they both were extraordinarily understanding, kind and
> compassionate to hear what I was facing.  Not only did they assure me
> I had nothing to worry about in losing my job, but they made sure that
> I understood that I had their support and offered any help that they
> could in completing my transition. The vp went back to her office and
> called the owner [Jim Torcia] to inform him and see if he agreed with
> their summation.  He too was very supportive and was only concerned
> that I would be able to continue doing my job, and if that was not a
> concern then I had nothing to worry about as well. He made sure that
> all employees understood the no harassment policy and that anyone
> who committed an infraction would be terminated.  All managers and
> employees were informed, and to my surprise and delight, I was met
> with nothing but kindness from all employees, even the crotchety old
> southern guys who I thought were set in their ways.

[49-6 at 1-2].

Plaintiff asserts that the supportive environment at Credit Nation ended two

weeks after Plaintiff announced the intended transition.  On November 12, 2009,

Mrs. Weston told Plaintiff to "tone things down" because Plaintiff "visit[ed] the

other technicians' stalls," and "talk[ed] about surgeries," including "breast

augmentation."  Weston Dep. at 34.  Mrs. Weston stated that these conversations

3

made the other technicians feel uncomfortable.  Plaintiff initially testified at a deposition that Mrs. Weston did not "specify" whether Plaintiff was told to "tone things down," at Mr. Torcia's direction, but Plaintiff assumed that the message came from Mr. Torcia.  Chavez Dep. at 47.  At a later point in the deposition, Plaintiff claimed that Mrs. Weston "told [Plaintiff] to tone it down because Mr. Torcia didn't like" Plaintiff discussing the intricacies of the transition with the other technicians.  Chavez Dep. at 131.

On November 17, 2009, Plaintiff accused Richard Randall ("Randall"), an automobile technician at Credit Nation, of being dishonest about a car repair. According to a Credit Nation disciplinary report, Plaintiff received a verbal warning from Mrs. Weston because Plaintiff made "derogatory comments" about Randall during an argument Plaintiff had with Randall.

On November 24, 2009, Mr. Torcia met with Plaintiff at the service facility. Plaintiff alleges that, at this meeting, Mr. Torcia told "[Plaintiff] his concerns, worries, and apprehensions" regarding the gender transition.  Chavez Dep. at 81. According to Plaintiff, Mr. Torcia stated that he was "nervous about [the transition]" and afraid that the transition may "impact his business" because "an applicant for a tech position declined his offer of employment [due to Plaintiff's] transition."  Id. at 82.  Plaintiff alleges that Mr. Torcia complained that her "attire

was upsetting other personnel," and advised Plaintiff not to "wear too feminine attire . . . coming to work or leaving work." Id. at 84-85.  Mr. Torcia also expressed his discomfort with Plaintiff wearing dresses, skirts and heels in the service department work area because Plaintiff's attire violated Credit Nation's workplace rules.  Technicians at Credit Nation are required to wear work pants, a uniform shirt, and rubber soled shoes that allow technicians to walk on greasy and slippery surfaces.  See Weston Dep. at 37-38.

In December 2009, Credit Nation approved two weeks of paid leave for Plaintiff, even though Plaintiff had accrued only a week of vacation time at that point.  The extended period was allowed "to accommodate" Plaintiff's sex reassignment surgery.  Chavez Dep. at 64-65; Torcia Dep. at 59.

On December 15, 2009, Plaintiff had another argument with Randall. According to Plaintiff, Randall was dissatisfied that "[Plaintiff] was getting special treatment from [Mrs. Weston]," because Plaintiff was "allowed to go to the doctor's appointment, do electrolysis almost every morning, and take excessive unpaid time to attend these doctor and therapist appointments."  Chavez Dep. at 61.  Other technicians at the service facility "were also upset and thought that [Plaintiff] was getting special treatment by being able to take time off from work and not having to make it up."  Weston Dep. at 148.  Plaintiff told Randall to

5

"leave [Plaintiff] alone" because Plaintiff had Mrs. Weston's personal number.

Chavez Dep. at 59-60.  Mrs. Weston told Plaintiff "that it had been brought to

[Mrs. Weston's] attention that [Plaintiff] had given the other employees the

impression that [Mrs. Weston] had given [Plaintiff her] cell phone number which

made [Plaintiff] special."  Weston Dep. at 144.  Plaintiff received a verbal warning

regarding Plaintiff's comment about getting special treatment from Mrs. Weston.

Mrs. Weston gave her personal cell phone number to the other technicians to dispel

any perception that Plaintiff was getting special treatment.  Weston Dep. at 118.

Mrs. Weston observed Plaintiff change into heels and a dress on several

occasions at around 5:30 p.m., and then go back into the service facility area.  As a

consequence, on December 16, 2009, Credit Nation issued a memo to all service

personnel, which explained that all technicians were required to be in uniform from

8:00 a.m. until 5:50 p.m., Monday through Friday.

On December 16, 2009, Kirk Nuhibian ("Nuhibian"), the shop foreman, told

Plaintiff not to use the unisex bathroom that is reserved for Credit Nation's

customers and office personnel.  Technicians at Credit Nation are required to use a

different bathroom because the technicians "wear dirty clothes," and accumulate

oil and grease on their shoes.  Chavez Dep. at 74; Nuhibian Dep. at 114; Weston

Dep. at 52.  Plaintiff started to use the unisex bathroom because she was wearing

6

women's clothes, and the technician's bathroom "was quite dirty and grimy," and it was "hard to use . . . without ruining clothes."  Chavez Dep. at 73.  Plaintiff objected to Nuhibian's instruction not to use the unisex bathroom because "[it] meant [Plaintiff] was going to be ruining clothes, and [Plaintiff] did not like that."  Id.

Later on December 16, 2009, Mrs. Weston emailed John McManus, an attorney who handled legal matters for Credit Nation, for advice regarding Plaintiff's use of the unisex bathroom.  In the email to McManus, Mrs. Weston stated:

> I wanted to give you a run down on what occurred today … There are two restrooms located at the Service Center, both are unisex bathrooms.  One is designated at [sic] Technicians [sic] restroom and the other is customer and office personnel.  The technicians are required to have their own restroom due to the oil and grease that accumilate [sic] on the bottom of their shoes and clothes.  There was a meeting discussing this two weeks prior … Louie returned today and confronted the shop foreman asking why there was restricted access to the customer restroom?  He was told by the shop foreman "all technicians have their own restroom, and we have to keep the customer restroom clean for the customers."  Louie asked who is allowed to use it? Shop foreman repsonded [sic] "Customers, Matt, Philip, Ariel, and Jennifer (parts), everyone except technicians due to the grease on shoes." . . . Louie responded "If Jennifer in parts can use it why can't I use it, that is decrimination [sic], I will speak with Phil about it." . . . Phil came in and Louie approached him and asked why can't we use the customer restroom? Phil stated, technicians have their own restroom, and remember the meeting we had two weeks ago about the restroom use? Louie shrugged his shoulders and turned and walked away.

[60-8 at 2-3]

McManus responded to Mrs. Weston with the following email:

> Cindy: I am concerned that no matter what you do, [Plaintiff] is going to come up with come [sic] complaint . . . I believe there needs to be some report written by Phil indicating the issues about the restroom and how that was resolved.  Tomorrow will bring more issues and I think this will get to a breaking point before very long.  Just have the management focus on work and performance of required duties and the other issues should be written up one at a time.

Id.

On January 8, 2010, Plaintiff arrived at work and clocked in at 7:39 a.m. Plaintiff did not change into Defendant's required uniform.  Plaintiff's deposition testimony was that there was "nothing to do," because the parts for a vehicle that Plaintiff was supposed to service had not arrived.  Chavez Dep. at 77.  Because it was a "very cold day," Plaintiff "decided to sit in [the] back of one of the cars [she] was working on . . . to try and get a little bit warm."  Id. at 77-78.  Plaintiff went to sleep in the back of the car.  At 9:20 a.m., Nuhibian saw Plaintiff sleeping in the car.  Nuhibian took a photograph of Plaintiff sleeping, and sent it to Mr. and Mrs. Weston.  At his deposition, Nuhibian testified that he photographed Plaintiff because on past occasions, technicians had denied any wrongdoing when Nuhibian had complained that the technicians had violated work rules.  Nuhibian Dep. at 48, 55.

8

At approximately 9:55 a.m., Plaintiff "heard a noise and I looked up and realized that I had nodded off without intending to."  Chavez Dep. at 78.  Plaintiff worked through the rest of the day and went home for the weekend.  Mrs. Weston informed Mr. Torcia that Plaintiff was sleeping in the car "while on the clock, which is against [Credit Nation's] policy."  Weston Dep. at 74.  Mr. Torcia and Mrs. Weston agreed to fire Plaintiff, and Mr. Torcia instructed Mrs. Weston to terminate Plaintiff's employment.  On January 11, 2010, Plaintiff was terminated for sleeping on the job.  A separation notice, dated January 11, 2010, explicitly states that Plaintiff was terminated for "[s]leeping while on the clock on company time."  [60-16 at 2].

Under Section 717 of Credit Nation's Employee Handbook, theft of company property results in immediate termination.  Mr. Torcia and Mrs. Weston testified that they considered sleeping on the job to constitute theft because an employee is being paid, but is not working.  Mrs. Weston also testified that another employee, who did not have previous write-ups in his file, had been terminated for sleeping on the clock.  Weston Dep. at 112.

In November 2009 and September 2010, Plaintiff went to the Equal Employment Opportunity Commission's ("EEOC") office in Atlanta to file a claim against Credit Nation for sex discrimination under Title VII of the Civil Rights

Act.  On both occasions, an EEOC investigator told the Plaintiff that she could not file a discrimination claim because transgender persons are not protected from discrimination on the basis of "sex" under Title VII.  In April 2012, Plaintiff went to the EEOC's office after hearing news reports that transgender persons had filed complaints with the EEOC.  On this occasion, Plaintiff was allowed to file a complaint for sex discrimination under Title VII.

      B.    <u>Procedural History</u>

On January 30, 2013, Plaintiff filed this action against Credit Nation, asserting claims of sex-based discrimination under Title I, 42 U.S.C. § 1981(a), and Title VII, 42 U.S.C. § 2000(e), of the Civil Rights Act of 1991.

On December 11, 2013, Credit Nation moved for summary judgment.  On July 18, 2014, Magistrate Judge Clay Fuller issued his R&R on the summary judgment motion.  In the R&R, the Magistrate Judge recommended that (i) Plaintiff's sex discrimination claim be equitably tolled because the EEOC misled Plaintiff about the nature of Plaintiff's rights under Title VII, and (ii) Defendant's Motion for Summary Judgment be granted because Plaintiff failed to show that Credit Nation's reason for terminating her employment was a pretext for unlawful discrimination.

On August 1, 2014, Plaintiff filed Objections [78] to the R&R, arguing that

there are genuine issues of fact regarding whether Credit Nation's decision to terminate Plaintiff was a pretext for unlawful discrimination.  On August 13, 2014, Defendant filed its reply to the Plaintiff's Objections to the R&R [79].  Defendant did not object to the R&R's findings and recommendations.

## II.    DISCUSSION

### A.    Legal Standards

#### 1.    *Standard of Review for R&Rs*

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1) (Supp. V 2011); Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  If no party has objected to the report and recommendation, a court conducts only a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

#### 2.    *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some

12

metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotations omitted).

    B.    Analysis

        1.    *Findings of the R&R*

            i.    Equitable Tolling

Plaintiff failed to exhaust her administrative remedies because she did not file a charge of discrimination with the EEOC within 180 days of the last discriminatory act.  See Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 (11th Cir. 2003).  Title VII's filing requirement is subject to equitable tolling under certain circumstances.  Bourne v. School Bd., 508 F. App'x 907, 909 (11th Cir. 2013).  The limitations period under Title VII may be equitably tolled if the EEOC misleads a complainant regarding the nature of his or her rights.  Jones v. Wynne, 266 F. App'x 903, 906 (11th Cir. 2008).  The Magistrate Judge concluded that the

statute of limitations should be equitably tolled in this case because the EEOC misled Plaintiff regarding her rights by informing Plaintiff that transgender persons cannot file claims for sex discrimination under Title VII.

In Price Waterhouse v. Hopkins, the United States Supreme Court held that discrimination on the basis of gender stereotypes is sex-based discrimination under Title VII. 490 U.S. 228, 235 (1989). In other words, Title VII prohibits employers from discriminating against employees for "failing to act and appear according to expectations defined by gender." Glenn v. Brumby, 683 F.3d 1312, 1316 (11th Cir. 2011). "[T]he very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior . . . there is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." Id. "Discrimination against a transgender individual because of her gender nonconformity is sex discrimination, whether its described as being on the basis of sex or gender." Id. at 1317.

The Magistrate Judge found that a majority of federal courts recognize that Title VII protects persons from discrimination based on gender non-conformity, and the EEOC misled Plaintiff when it told Plaintiff that she could not bring a claim for gender discrimination under Title VII. The Court finds no plain error in

14

this finding.  Because Title VII protects discrimination based on gender
stereotypes, Plaintiff can assert a sex discrimination claim because Plaintiff was
transitioning from a male to a female, and Plaintiff essentially claims that the
failure to conform to male stereotypes caused Plaintiff's termination.  The Court
finds no plain error in the Magistrate Judge's recommendation that Plaintiff's sex
discrimination claim is required to be equitably tolled.  See Smith v. Baldwin Cnty.
Comm'n, No. 09-0616-CG-M, 2010 WL 2200713, at *3 (S.D. Ala. Mar. 26, 2010)
(applying equitable tolling to a discrimination claim because an EEOC investigator
incorrectly told plaintiff that she did not have a valid retaliation claim).

ii.     Discrimination Claim—Pretext

Under the McDonnell Douglas framework, a prima facie case of sex
discrimination is established if the plaintiff shows that "(1) she is a member of a
protected class, (2) she was qualified for the job, (3) she was subjected to an
adverse employment action, and (4) her employer treated similarly situated
employees outside her class more favorably."  Curtis v. Broward Cnty., 292 F.
App'x 882, 883 (11th Cir. 2008).

For the purpose of the Court's review of the R&R, the Court assumes that
Plaintiff established a prima facie case of discrimination.  Because Defendant
offered evidence of a legitimate business reason for Plaintiff's discharge, and in

15

light of Plaintiff's objection, the Court reviews *de novo* whether Plaintiff has

offered evidence that there are disputed issues of fact regarding whether the reason

for Plaintiff's termination was a pretext for unlawful discrimination.[2]

     Credit Nation articulated a legitimate, nondiscriminatory reason for

Plaintiff's termination, and thus the burden shifts to Plaintiff to produce evidence

"sufficient to permit a reasonable factfinder to conclude that the reasons given by

[Credit Nation] were not the real reasons for the adverse employment decision."

Chapman v. Al Transp., 229 F.3d 1012, 1024 (11th Cir. 2000).  Plaintiff must

demonstrate "such weaknesses, implausibilities, inconsistencies, or contradictions

in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could find them unworthy of credence."  Combs v. Plantation Patterns,

Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997).  If the proffered reason

for termination "is one that might motivate a reasonable employer, an employee

must meet that reason head on and rebut it, and the employee cannot succeed by

simply quarrelling with the wisdom of that reason."  Chapman, 229 F.3d at 1030.

     The Magistrate Judge found that a reasonable juror would not conclude that

---

[2] Neither party objected to the Magistrate Judge's recommendation that Plaintiff met its burden to show a prima facie case, and that Defendant met its burden to show a legitimate, nondiscriminatory reason for the termination.  The Court finds no plain error in these findings.

Plaintiff's failure to conform to gender stereotypes motivated Credit Nation's decision to terminate her employment, and thus recommended that summary judgment be granted to Defendant.  Plaintiff objects to the Magistrate Judge's finding that there is not any evidence that Credit Nation's reason for terminating her employment was motivated by unlawful discrimination.  Plaintiff contends that she raised five categories of evidence to show that Credit Nation's decision was a pretext for unlawful discrimination, and argues that the Magistrate Judge improperly discounted the strength of the offered evidence.  The Court disagrees.

Plaintiff argues that the circumstances, prior to, and at the time of her termination suggest that she was fired because of her failure to conform to gender stereotypes.  To support this claim, Plaintiff argues that Mrs. Weston's November, 12, 2009, request "to tone it down," "was not a perfectly reasonable request not to talk about breasts and surgeries, but an attempt to tell Plaintiff that her gender and gender identity were not appreciated [at Credit Nation], that coworkers were uncomfortable with her, and that she should tread carefully lest she find herself in disciplinary trouble or worse."  Pl.'s Objections at 8.  Plaintiff now concedes that Mrs. Weston's admonishment that Plaintiff should refrain from discussing graphic details about Plaintiff's transition with other employees was "perfectly reasonable."  Id.  There is no evidence to support Plaintiff's contention that Mrs.

17

Weston made any statements that can be construed as a warning that Plaintiff "should tread carefully lest she find herself in disciplinary trouble or worse" *because of* her protected status. Id. Mrs. Weston testified that she told Plaintiff "to tone things down" because Plaintiff "visit[ed] the other technicians' stalls" during work hours to "talk about surgeries," including "breast augmentation." Weston Dep. at 34. Plaintiff has not presented any evidence to rebut Mrs. Weston's testimony.

Plaintiff next argues that a December 16, 2009, email, from McManus to Mrs. Weston, shows that Credit Nation was "searching" for reasons to terminate her because Plaintiff is a transgender person. In the December 16, 2009, email, McManus wrote to Mrs. Weston and stated that "tomorrow will bring more issues and I think this will get to a breaking point before very long. Just have the management focus on work and performance of required duties and the other issues should be written up one at a time." McManus's cogent legal advice to Credit Nation was given after Plaintiff received two disciplinary warnings. On November 17, 2009, Plaintiff received a verbal warning for directing to Randall work-related "derogatory comments." On December 15, 2009, Plaintiff received a verbal warning for giving other technicians the impression that Plaintiff was "special" in the eyes of her immediate supervisor because Plaintiff had the

supervisor's cell phone number.  In this context, no reasonable juror would read McManus's email to conclude that Credit Nation was "searching" for reasons to terminate Plaintiff because of Plaintiff's failure to conform to gender stereotypes.

Plaintiff next argues that Mr. Torcia did not believe that sleeping on the clock was a terminable offense.  Plaintiff asserts that Mr. Nuhibian and Mr. Weston allowed Plaintiff to remain asleep in the car for nearly 45 minutes. Plaintiff speculates that if sleeping on the clock were a terminable offense, Mr. Nuhibian and Mr. Weston would not have allowed Plaintiff to continue to sleep.  The Magistrate Judge rejected this argument because Plaintiff is required to establish that the ultimate decisionmaker did not reasonably believe that sleeping on the job was a serious offense subject to immediate termination.  See Wiggins v. Sec'y Dep't of Army, 520 F. App'x 799, 801 (11th Cir. 2013) ("When considering whether the basis for an employer's termination was merely pretext, the proper inquiry is whether the decisionmaker believed the employee was guilty of misconduct and whether that belief was the reason for the employee's discharge."). Plaintiff failed to offer evidence that Mr. Torcia, or any of Plaintiff's supervisors, did not reasonably believe that sleeping on the job is an offense subject to termination.

Mr. Torcia, the owner of Credit Nation, was the ultimate decisionmaker, and

he testified unequivocally that sleeping on the job is a terminable offense.  There also is no dispute that Credit Nation terminated another employee for sleeping on the job even though that employee had an unblemished disciplinary record.  Plaintiff states that the Magistrate Judge overlooked that "there is an inference that [Nuhibian and Weston allowed Plaintiff to continue sleeping] because [they] were part of a silent agreement to find some reason to terminate [Plaintiff]."  Pl.'s Objections at 11.  This conclusory and speculative allegation is not supported by specific facts in the record, and it is insufficient to defeat a motion for summary judgment.  See Ojeda v. Louisville Ladder, Inc., 410 F. App'x 213, 214 (11th Cir. 2010) (holding that conclusory allegations have no probative value, and a nonmoving party cannot rely on conclusory allegations to avoid summary judgment).

Plaintiff argues that Mr. Nuhibian's statement to her that "I know for a fact you were run out of [C]redit [N]ation," shows that Plaintiff was fired because of her failure to conform to gender stereotypes.  Mr. Nuhibian testified at his deposition that this statement referred to the fact that he was the one who took Plaintiff's picture and ultimately got her fired.  Nuhibian Dep. at 31-33.  Mr. Nuhibian disputed that Credit Nation was looking for ways to terminate Plaintiff.  Plaintiff has failed to show that the reason for her termination—sleeping on the

job—was a pretext for unlawful discrimination.

Plaintiff next argues that Credit Nation's decision was a pretext for unlawful discrimination because Defendant failed to abide by its progressive discipline policy. This claim is unconvincing. Credit Nation reserves the right to use progressive discipline at its discretion, and the Employee Handbook explicitly states that Credit Nation has the "right to terminate employment at will, with or without cause or advance notice." See Vergers v. Am. Vulkan Corp., 8:10-CV-2164-T-24, 2012 WL 95306, at *8 (M.D. Fla. Jan. 12, 2012) (finding no evidence of pretext where a progressive discipline policy was discretionary). Plaintiff has not presented any evidence that Credit Nation applied its disciplinary rules in a discriminatory manner. The uncontested evidence shows that another employee was immediately terminated for sleeping on the job, even though the employee did not have any disciplinary problems. The evidence further shows that Plaintiff previously had received two disciplinary warnings regarding work related conduct showing that progressive discipline was administered, even if not required in this case based on the sleeping episode.

Finally, Plaintiff asserts that the "circumstances suggest a post-hoc fabrication of a zero-tolerance policy" for sleeping on the job, and that Defendant's rationale for termination changed over time. An employer's decision to rely on

evidence obtained after the decision to terminate an employee has already been taken may be evidence of pretext.  Rosenfeld v. Wellington Leisure Prod. Inc., 827 F.2d 1493, 1496 (11th Cir. 1987).  That is not the case here.  On January 11, 2010, Plaintiff was terminated for sleeping on the job.  A separation notice, dated January 11, 2010, explicitly states that Plaintiff was terminated for "[s]leeping while on the clock on company time."  Credit Nation did not rely on any evidence obtained after Plaintiff was terminated.  Credit Nation's reason for terminating Plaintiff has not changed.  In its Motion for Summary Judgment, Credit Nation proffered additional reasons to justify Plaintiff's termination, including two disciplinary warnings, violation of six other work rules, and excessive absences.  "If an employer offers different reasons for terminating an employee, those reasons must be fundamentally inconsistent in order to constitute evidence of pretext."  Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 210 (11th Cir. 2008).  Plaintiff was terminated for sleeping on the job, and there is no conflict between that reason for her termination and any other reason that has been offered by the Defendant in this litigation or before the EEOC.

There is no evidence of unlawful discrimination in this case.  Mr. Torcia's isolated remarks regarding Plaintiff's transition that were made in a meeting unrelated to the adverse employment action taken against Plaintiff are insufficient

to establish discrimination in the absence of "some additional evidence supporting a finding of pretext."[3]  Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1229 (11th Cir. 2002).  Plaintiff has failed to present evidence to support that the reason for her termination was a pretext for unlawful discrimination.  Plaintiff was terminated for sleeping on the job, and Plaintiff has failed to "meet that reason head on and rebut it, and [Plaintiff] cannot succeed by simply quarrelling with the wisdom of that reason."  Chapman, 229 F.3d at 1030.  Based on de novo review of the R&R, the Court determines that Plaintiff's objections to the Final R&R are required to be overruled, and Credit Nation's Motion for Summary Judgment is granted because, in light of the entire record, no reasonable juror would find that Plaintiff's discharge was a pretext for unlawful discrimination.[4]  See Scott, 295

---

[3] Mr. Torcia's comments here are not evidence of discriminatory animus.  He only mentioned that Plaintiff's transition—for which he expressed unreserved support so long as Plaintiff performed her duties—might impact his business.  Mr. Torcia's support of Plaintiff and her decision to transition was accompanied by Defendant's willingness to give Plaintiff considerable time off for all of the transition treatments required.

[4] Plaintiff concedes that federal courts in this circuit apply the McDonnell Douglas burden-shifting analysis to single motive cases and mixed-motive cases alike, but insists that the Magistrate Judge should have applied the Sixth Circuit's test for "mixed-motive" to determine whether Credit Nation terminated her employment because of her failure to conform to gender stereotypes.  Plaintiff does not explain why this action is a "mixed motive case," and why the Sixth Circuit's test for "mixed-motive" cases applies here.  In "mixed-motive cases, the theory of liability is that the employer was motivated by both legitimate and discriminatory motives

F.3d at 1230 (observing that "evidence relating to the discriminatory comments had to be read in conjunction with the entire record and considered together with the other evidence in the case.  Because the alleged comment . . . was an isolated comment, unrelated to the decision to fire [the plaintiff], it, alone, is insufficient to establish a material fact on pretext") (internal citations and quotation marks omitted).

III.   **CONCLUSION**

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge J. Clay Fuller's Final Report and Recommendation [76] is **ADOPTED**, and the Plaintiff's Objections [78] are **OVERRULED**.

**IT IS FURTHER ORDERED** that the Defendant's Motion for Summary Judgment [48] is **GRANTED**.

---

in making the challenged decisions."  Woods v. Austal, U.S.A., LLC, CIV. A. 09-0699-WS-N, 2011 WL 1380054, at *10 (S.D. Ala. Apr. 11, 2011).  In a "mixed-motive" case, the plaintiff bears the initial burden to "present sufficient evidence for a reasonable jury to conclude [that her sex] was a motivating factor" in the challenged employment decision.  Lewis v. Metro Atlanta Rapid Transit. Auth., 343 F. App'x 450, 455 (11th Cir. 2009).  Even if the Court applied the "mixed-motive" test in this matter, Plaintiff has failed to show that Plaintiff's failure to conform to gender stereotypes was a "motivating factor" that drove Credit Nation's decision to terminate her employment.  Plaintiff was terminated for sleeping on the job.  That was the event that resulted in Plaintiff's termination.

**SO ORDERED** this 12th day of September, 2014.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE